Eiko Uehara ROSE, Appellant,

v.

Robert S. McNAMARA, Secretary of Defense, Appellee.

No. 20323.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 11, 1967.

Decided March 23, 1967.

Mr. Stuart H. Robeson, Washington, D. C., with whom Mr. Roger E. Brooks, Washington, D. C., was on the brief, for appellant. Mr. Warren E. Magee, Washington, D. C., also argued for appellant. Mr. Hans A. Nathan, Washington, D. C., also entered an appearance for appellant.

Mr. Walter H. Fleischer, Atty., Dept. of Justice, with whom Acting Asst. Atty. Gen., J. William Doolittle, Messrs. David G. Bress, U. S. Atty., and Morton Hollander, Atty., Dept. of Justice, were on the brief, for appellee. , Mr. John C. Eldridge, Atty., Dept. of Justice, also entered an appearance for appellee.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and McGOWAN, Circuit Judge.

## McGOWAN, Circuit Judge:

Appellant, a naturalized American citizen residing on the island of Okinawa in the Ryukyu Islands, was convicted of evading income taxes imposed by a local taxing statute. Her trial was had before a jury in a local court created as part of the machinery for the government of Okinawa after its capture by the United States in World War II. An appellate court in the same judicial system having denied her appeal, she brought suit against the Secretary of Defense in the United States District Court of the District of Columbia, seeking a declaratory judgment that her conviction was a nullity. The case was heard on appellant's motion for summary judgment and appellee's motion for judgment on the pleadings. The court denied the former and granted the latter, dismissing the complaint. This appeal is from that judgment. We affirm.

## I

A variety of arguments have been pressed upon us as to why appellant's conviction in the Okinawan court should be nullified. In their profusion they present a somewhat duplicative aspect [1] which makes it unnecessary to comment upon each one, although we have considered them all.[2] The central thrust of appellant's position is directed against the power of the President, as distinct from the Congress, to provide for the governance of Okinawa during the period when the responsibility for doing

[1.] New and additional counsel came into this appeal at the time of the filing of appellant's reply brief shortly before oral argument. This brief contained new points and a restatement of old ones, and was obviously regarded by counsel as the primary vehicle for the presentation of appellant's case. This was as irregular as it was confusing, and the Government's motion to strike was well taken. We have concluded to deny that motion in the interest of advancing this litigation towards a state of repose.

[2.] Subsequent to the entry of judgment against her by the district court, the appellant filed a motion to amend the jurisdictional allegations in her complaint and a separate motion to perpetuate testimony. She complains that the district court erred in denying her motions. Each is properly addressed to the discretion of the district court; and, in the circumstances of this case, we see no reason for interfering with its exercise of that discretion. See FED.R.CIV.P. 15(a); 27(b). Appellant also urges that, conceding for the sake of argument that the President had authority to provide as he did for the Ryukyuan Islands, he unlawfully delegated this authority both to the Secretaries of State and Defense and to the High Commissioner of the Islands. Her position manifests a misunderstanding of the nature of the President's office. The President is not required to exercise his authority over the Islands in person, any more than he is required personally to carry out his other responsibilities. Sardino v. Federal Reserve Bank of New York, 361 F.2d 106, 110 (2d Cir.), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L. Ed.2d 130 (1966). See also Russell Motor Car Co. v. United States, 261 U.S. 514, 523, 43 S.Ct. 428, 67 L.Ed. 778 (1923).

so resides only in the United States. In order to appraise the claims advanced by appellant, it is necessary to examine how that responsibility came into being and how it has been met.

Okinawa, the largest and most important island in the Ryukyus, was taken from Japan and occupied by the United States during the last battle of World War II. American military government was instituted and continued beyond the cessation of actual hostilities. On April 28, 1952, Japan entered into a Treaty of Peace with the Allied Powers, including the United States. Article 3 of the Treaty dealt with the Ryukyus and provided:

> Japan will concur in any proposal of the United States to the United Nations to place under its trusteeship system, with the United States as the sole administering authority, Nansei Shoto south of 29° north latitude (including the Ryukyu Islands and the Daito Islands). * * * Pending the making of such a proposal and affirmative action thereon, the United States will have the right to exercise all and any powers of administration, legislation and jurisdiction over the territory and inhabitants of these islands, including their territorial waters.

[1952] 3 U.S.T. & O.I.A. 3169, 3172–73, T.I.A.S. No. 2490.

Acting pursuant to this treaty, President Eisenhower, on June 5, 1957, issued Executive Order No. 10713, 22 Fed.Reg. 4007, U.S.Code Cong. & Admin.News 1957, p. 903. This Order made provision for the continuance of the existing central Government of the Ryukyus, with a legislature directly elected by the people of the Islands. It also provided for a civil administration under the Department of Defense. The head of the civil administration was a High Commissioner desig-

nated by the Secretary of Defense. The executive power of the Government was described, however, as vested in a Chief Executive who must be a Ryukyuan and who was to be appointed by the High Commissioner after consultation with the legislature. The Chief Executive and the High Commissioner had, in turn, veto power over the legislature, but, in the case of the High Commissioner, this was severely limited by a 1962 amendment of the 1957 Executive Order. Exec. Order No. 11010, 27 Fed.Reg. 2621, U.S.Code Cong. & Admin.News 1962, p. 4326.

■■ The legislature was empowered to act with reference to "all subjects of legislation of domestic application." Provision was expressly made for the reporting to the Congress of the United States of all laws enacted by the Ryukyuan legislature.[3] In its treatment of judicial power, the Order differentiated between the Government of the Ryukyuan Islands, on the one hand, and the civil administration, on the other. Each was to have a system of trial and appellate courts, with both civil and criminal jurisdiction. Criminal jurisdiction over American military personnel and other Americans on the Islands as employees of the United States Government, including their dependents, was generally reserved to the courts of the civil administration; and that reserved jurisdiction expressly extended to penal laws enacted by the Ryukyuan legislature. Judges of the civil administration courts are American citizens in the employ of the United States Government; and they are appointed by the High Commissioner. By an ordinance of the civil administration promulgated in 1963, grand jury indictment and petit jury trial were assured for criminal defendants in the civil administration courts.[4]

Appellant operated an Okinawan business known as the Tea House August

---

3. "The High Commissioner shall report to the Secretary of Defense all laws enacted by the legislative body of the Government of the Ryukyu Islands and the said Secretary shall report the same to the Congress of the United States." Exec. Order No. 10713, section 7, *supra*.

4. This ordinance reflects the concern of the Supreme Court in Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), that American civilians tried for crimes abroad under tribunals of United States provenance shall not be shorn of the protections of the Bill of Rights.

Moon. She was charged in a grand jury indictment with evading payment of income taxes to the Government of the Ryukyus in the total amount of about $70,000 relating to the period from 1957 to 1962. The tax liability arose under an income tax law passed by the Islands legislature in 1952. Represented by counsel, she was tried by a jury, convicted on one count and acquitted on other counts, and fined $8,000. Again represented by counsel, she appealed to the civil administration appellate court which, with opinion, affirmed the conviction.

## II

Amid the welter of contentions pressed upon us by appellant through her two-platoon system of counsel, we are not able to discover any claim that the income tax law itself could not validly be applied to appellant, as distinct from her claim that the tribunal in which she was tried could not validly punish her for its violation. This law, we remind,

was not a part of the Internal Revenue Code applicable to American citizens generally. It was a purely local income tax passed by the Ryukyuan legislature and applicable only within the territory subject to its legislative jurisdiction. Thus, without intending any inference as to the precise significance of the difference, we remark that we are not dealing here with an American citizen charged with a U.S. Code crime created by Congress.

■ What is insisted upon by appellant is that a United States citizen cannot be convicted of crime except in an Article III court set up by Congress.[5] She asserts that the civil administration courts have no such derivation, but are, rather, an arm of the Executive. This characterization seems to us quite accurate, but it does not compel the result appellant seeks.

This issue was dealt with at some length in the opinion of the distinguished District Judge, 252 F.Supp. 111 (D.D.C. 1966); and we need not retrace his

---

Our own District Court on two earlier occasions has held that the absence of the jury system in the civil administration courts in Okinawa invalidated criminal convictions. In re Nicholson, H.C. 141–61, D.D.C., Nov. 19, 1963, and Ikeda v. McNamara, H.C. 416–62, D.D.C., Oct. 19, 1962. Appellant argues in her reply brief that her conviction was invalid because the petit jury that convicted her was not made up exclusively of American citizens. She points in this regard to 28 U.S.C. § 1861 (1964), which requires that federal jurors be citizens. But this statute relates to the United States District Courts, and we are admittedly not dealing here with a court of that kind trying a U.S. Code offense. 18 U.S.C. § 3231 (1964) gives those courts original jurisdiction of "all offenses against the laws of the United States." The law which appellant was found to have violated clearly seems to us not to have been such a law. In addition to this specific allegation, appellant argues generally that she has been deprived of numerous constitutional rights by virtue of her trial in the civil administration courts. Our reading of the record comports, in every respect, with that of the district court judge who found that "the record in no way reflects a denial of constitutional rights resulting from the operation of the courts of the Ryukyu

Islands." 252 F.Supp. 111, 113 (D.D.C. 1966).

5. The appellant's argument on this level reduces to the proposition that Reid v. Covert, 354 U.S. 1, 7, 7 S.Ct. 1222 (1957), requires that she be tried in an Article III court, presided over by an Article III judge. In so maintaining, she misinterprets the *Reid* decision. While Mr. Justice Black held in *Reid* that Article III, *Section Two*, providing for a jury trial at the location of a crime, is a vital constitutional protection which the United States cannot ignore when acting against its citizens abroad, nowhere did he accord the same status to Article III, *Section One*, which gives to Congress the power to establish courts and judicial positions. It is Article III, Section One, upon which appellant places great reliance in urging that her constitutional rights have been violated, for the record is clear that there have been no violations of her Article III, Section Two rights. We note only that American citizens are tried every day in the District of Columbia for criminal offenses in courts and by judges not deriving from Article III, Section One, although they are accorded Article III, Section Two rights.

steps.[6] He has discussed the very special nature of our relationship with Okinawa, and has appropriately measured Presidential power by reference to it. Okinawa fell into our charge as an incident of our military operations against Japan in the Pacific. Unlike the course we followed after the Spanish-American War in respect of Puerto Rico and the Phillippines, we have, vis-a-vis Okinawa, been a most reluctant conquerer indeed. In the Treaty of Peace with Japan we signified our purpose not to hold Okinawa as a United States possession but to put it in due course under the United Nations trusteeship system. More latterly it has become a stated objective of our international policy to restore Okinawa to Japan.[7]

In the Executive Order issued in implementation of the Peace Treaty, President Eisenhower declared at the outset the amenability of its provisions to action by Congress.[8] Congress has, however, remained content for a decade to allow Okinawa to be governed under the terms of the Order. The reasons for this inaction are not hard to divine. They reflect what appears to be a national consensus that our possession of Okinawa is, by our own design, temporary; and that a wise concept of our foreign relations points in the direction of its being returned, sooner rather than later, to a Japan which has, in no small part because of a host of similar forbearances on our part, become a strong bulwark of the free world in the Far East. In this posture, when our friends in Japan look expectantly to an early restoration of these islands, the assertion by Congress of its authority to create permanent and detailed laws for the government of the Ryukyus would be as impolitic as it would, hopefullly, be short-lived and thereby wasteful of Congressional energies.

The power of the President in the conduct of governmental business of international consequence has traditionally been viewed by the courts as broad. See United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319, 57 S.Ct. 216, 81 L.Ed. 255 (1936). In any event, the problem here is not a clash between the respective authorities of President and Congress. As noted above, the Executive Order defers in terms to the contingency of Congressional action to provide for the government of the islands. The inaction of Congress thus far has certainly not been due to its lack of awareness of the arrangements which the President has made. The Executive Order, as we have seen, requires that Congress be kept informed of all laws passed by the Islands legislature. Moreover, Congress is regularly called upon to appropriate funds for, and to make disposition of certain revenues accruing to the United States from, the operation of the governmental arrangements provided by the Executive

6. The United States Court of Military Appeals has also had occasion to consider the constitutionality of the civil administration courts of the Ryukyus; and this tribunal has approved the use of presidential power to establish these courts because, "in the absence of * * * action, by Congress, or previous statute, the responsibility for administering the civilian government of the area remained with the President." United States v. Vierra, 14 U.S.C.M.A. 48, 50 (1963).

7. President Kennedy, in a statement to accompany Exec. Order No. 11010, March 16, 1962, which amended President Eisenhower's original order setting up the Government of the Ryukyus, declared it to be the public policy of the United States that we recognize the Ryukyus as "a part of the Japanese homeland and look forward to the day when the security of the Free World will permit their restoration to. full Japanese sovereignty." 1962 PUBLIC PAPERS OF THE PRESIDENTS 247–48. For similar statements, see 48 DEP'T STATE BULL. 770 (1962) (referring to "the anticipated eventual restoration of these islands to Japanese administration"); 45 DEP'T STATE BULL. 57–58 (1961); 37 DEP'T STATE BULL. 52 (1957).

8. "*Except as the Congress may otherwise provide by law with respect to the Government of the Ryukyu Islands*, all administrative, legislative, and jurisdictional powers reposed in the United States by Article 3 of the Treaty of Peace with Japan shall be exercised in accordance with this order." Exec. Order No. 10713, section 1, *supra.* [Emphasis added.]

Order.[9] We are not, under these circumstances, inclined to view the mere absence of Congressional action as implying either Congressional ignorance of, or dissatisfaction with, the Presidential course.[10]

■■ Appellant insists, however, that her constitutional rights are violated unless she is tried in an Article III court, which only Congress can provide. The Supreme Court has, however, recognized an extensive power in the President, absent Congressional provision, to set up special tribunals in occupied foreign lands to try American citizens for crime. This is Madsen v. Kinsella, 343 U.S. 341, 72 S.Ct. 699, 96 L.Ed. 988 (1952), where the Court expressly noted that this power on occasion survives the cessation of hostilities.[11] We think that, under the special circumstances of our relationship to Okinawa, it can survive the Treaty of Peace.

Affirmed.

9. Congress has appropriated funds to build the civil administration courthouse, see *Hearings Before the Subcommittee of the House Committee on Appropriations*, 89th Cong., 1st Sess. 169 (1959), and continuously has appropriated funds to assist the civil administration of the Ryukyus, e.g., H.R. Doc. 15 (Part I), 89th Cong., 1st Sess. 228 (1965). In Section 3 of the Act of July 12, 1960, 74 Stat. 461, Congress expressly provided for the disposition of "fines, fees, and forfeitures received by the civil administration of the Ryukyu Islands," and, in Section 6 of the same Act, it provided that "nothing in this Act shall be construed to extend the application of any law of the United States to the Ryukyu Islands which would not otherwise be applicable there." For other examples of Congressional awareness of the exercise of Executive power in the Ryukyus, see *Hearings Before the House Committee on Armed Services on Sundry Legislation Affecting the Naval and Military Establishments*, 84th Cong., 2d Sess. (1955). See also 75 Stat. 463 (1961), 22 U.S.C. § 1945 (1964).

10. As noted above, appellant does not press upon us a claim that the President could not exercise authority over the Ry-

ukyus if he had been delegated such power by Congress. That he could so act has long been settled law. American Ins. Co. v. 356 Bales of Cotton (Canter), 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828). See generally 1 MOORE, FEDERAL PRACTICE 22–66 (2d ed. 1964).

11. "It is suggested that, because the occupation statute took effect September 21, 1949, whereas the crime charged occurred October 20, 1949, the constitutional authority for petitioner's trial by military commission expired before the crime took place. Such is not the case. The authority for such commissions does not necessarily expire upon cessation of hostilities or even, for all purposes, with a treaty of peace. It may continue long enough to permit the occupying power to discharge its responsibilities fully. Santiagos v. Nogueras, 214 U.S. 260, 29 S.Ct. 608, 53 L.Ed. 989; Neely v. Henkel, 180 U.S. 109, 124, 21 S.Ct. 302, 45 L.Ed. 448; Burke v. Miltenberger, 19 Wall. 519, 22 L.Ed. 158; Leitensdorfer v. Webb, 20 How. 176, 15 L.Ed. 891; Cross v. Harrison, 16 How. 164, 14 L.Ed. 889." Madsen v. Kinsella, 343 U.S. at 360, 72 S.Ct. at 710.