FUJI PHOTO FILM COMPANY, INC.,
Plaintiff-Appellant Cross-Appellee,

v.

SHINOHARA SHOJI KABUSHIKI KAI-
SHA and Graphic Machinery Interna-
tional, Inc., Defendants-Appellees
Cross-Appellants.

No. 84–2061.

United States Court of Appeals,
Fifth Circuit.

March 7, 1985.

Rehearing and Rehearing En Banc
Denied April 19, 1985.

592

Sughrue, Mion, Zinn, MacPeak & Seas,
Robert G. McMorrow, Cynthia Clarke Dale,
Washington, D.C., Vaden, Eigkenroht,
Thompson, Bednar & Jamison, G. Byron
Jamison, II, Houston, Tex., for plaintiff-ap-
pellant cross-appellee.

Edmund F. Bard, C. Alan McClure, Houston, Tex., for defendants-appellees cross-appellants.

Before GEE, WILLIAMS and JOLLY, Circuit Judges.

GEE, Circuit Judge:

This action arises from a dispute between two Japanese corporations, both of which claim the right to use the trademark "FUJI" on graphic arts equipment and supplies in the United States. Plaintiff-appellant Fuji Photo Film Co., Ltd. (Fuji) and defendant-appellee Shinohara Shoji Kabushiki Kaisha (Shinohara) each alleged trademark infringement and unfair competition by the other under federal, state, and common law. Both now appeal the decision of the trial court that Fuji take nothing by its claim against Shinohara, and Shinohara take nothing by its counterclaim against Fuji. Shinohara also appeals the trial court's denial of its request for attorneys' fees. We reverse as to Fuji's claim, and affirm as to Shinohara's counterclaim and request for attorneys' fees.

*Facts*

Fuji is a Japanese corporation founded circa 1934 which has used "FUJI" as its tradename and as a trademark on its products since its inception. Fuji makes various products related to photography and graphic arts, all of which it sells in the United States through its wholly-owned subsidiary Fuji Photo Film U.S.A., Inc. (Fuji USA), a New York corporation. Fuji obtained its first United States registered trademark, "FUJI", for photographic chemicals, in December 1954. Between 1954 and 1972, Fuji obtained nine United States registered trademarks for "FUJI" or composite words containing "FUJI", these registrations covering a variety of photography-related products, some of which are used in the offset printing process. Fuji products have been sold in the United States under the "FUJI" trademark since 1954; since 1965, those relating to graphic arts (rather than amateur photography) have been sold here by Roberts & Porter (Roberts), an Illinois corporation which buys them from Fuji USA.

All of Fuji's products are of the highest quality and have an international reputation for excellence; Fuji won an academy award in 1982 and its "FUJI" film was the official film of the 1984 Summer Olympics. As these facts indicate, Fuji spends a lot of money on advertising (in the millions of dollars); its annual sales in the United States are in the billions of dollars.

Shinohara is also a Japanese corporation, founded in 1919. It has been making and selling printing presses since 1947. These presses have been trademarked "FUJI" in Japan since 1961. Its first United States sale of a printing press occurred in January 1978.[1] Shinohara filed five applications in 1980 to register the trademark "FUJI", standing alone or with additional words, in the United States. Fuji has filed oppositions to each of these applications; action on the oppositions has been suspended pending the outcome of this litigation.

Shinohara presses are sold in the United States by three companies, including Sundman International, Inc. (Sundman) and defendant Graphic Machinery International, Inc. (Graphic). Fuji first became aware of Shinohara's use of the "FUJI" mark in the United States in 1978, when both Sundman and Roberts exhibited their principals' products at a California trade fair. At that time, Sundman's corporate name was Fuji Graphics, Inc. Sundman's display of "FUJI" presses and "FUJI" brochures alarmed the Roberts representatives, who thought that Fuji had reneged on its exclusive distribution arrangement with them. Visitors to the show also inquired about the connection between the two "FUJIs".

---

1. Shinohara contended at trial and contends here that its sale in 1967 of one printing press to a resident of Okinawa was a sale "in the United States." We reject this contention for reasons discussed below.

There was thus actual confusion at the trade show.

After the show, reports of Sundman's and Shinohara's use of "FUJI" in the United States sped quickly up the Roberts chain of command and thence up that of Fuji. When the news reached Fuji's supervisor of trademarks, he wrote letters to and met with his opposite number at Shinohara. The substance of these communications is disputed. It is undisputed that Fuji then brought an action in the United States district court for the central district of California against Fuji Graphics, Inc., Sundman's company, alleging trademark infringement and unfair competition. Sundman and his lawyer "promptly traveled to Japan to explain the nature and possible consequences of such litigation, and to persuade the management of Shinohara to assume defense of the case," pursuant to the terms of their contract.[2] Shinohara was not persuaded and took no part in the case.

In August 1979, the trial court entered a consent judgment in which, among other things, Fuji's various "FUJI" trademarks were found valid, Fuji was found to be the owner of the "FUJI" trademark as applied to graphic arts equipment and materials, and the defendant admitted that his corporate name and the Shinohara "FUJI" materials infringed Fuji's trademarks. The defendant and "any and all persons in active concert or participation with it" were permanently enjoined from use of the name "FUJI" and from sale, distribution or advertising of graphic arts-related products bearing or including the name "FUJI". In compliance with the terms of the judgment, Sundman changed the name of his company and asked Shinohara to stop sending him products marked "FUJI". Shinohara continued to send them, and Sundman to

deal in them. In an order entered in September 1980, the court held Sundman in contempt.

In July 1980, another Roberts representative saw more offset presses marked "FUJI" at another trade show, this time in Texas. The sight engendered the same series of reactions, resulting in this lawsuit.

### Likelihood of Confusion

■■■ Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), governs suit for infringement of a registered trademark.

Prior to 1962, § 1114(1) provided that the use of the mark must be 'likely to cause confusion, or to cause mistake, or to deceive <u>purchasers as to the source or origin of such goods or services</u>.' (emphasis added). In 1962, it was amended to delete the underlined portion. Although this amendment 'clearly broadened the protection afforded by the statute,' it is equally clear that this amendment did not delete the confusion requirement entirely, and that a claimant must still prove a likelihood of confusion, mistake or deceit of 'typical' purchasers, or potential purchasers, as to the connection of the trademark owner with the infringing product.

*Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1082 n. 3 (5th Cir.1982) (citations omitted). "Likelihood of confusion" is thus the central issue in any suit for trademark infringement, as it is in suits for unfair competition.[3] Fuji contends that the trial court used the wrong legal standard to determine likelihood of confusion. We are

---

**2.** The contract between Shinohara and Sundman contained the following clause:

 7. DESIGNS, TRADEMARKS AND PATENTS.

 To the best of Principals' knowledge the Commodities do not infringe on Patents, Designs and Trademarks in the U.S. In the event that an injunction regarding Patents, Designs, Trademarks is filed against Importer, Principal will at his option do one of the

following, (1) re-design; (2) buying back at original selling price the Commodities already in Importer's possession absorbing shipping charges; (3) defending Importer in a U.S. court of law at Principals' expense.

**3.** Because all of the claims asserted by the parties here hinge on the same issue, likelihood of confusion, we do not consider them separately.

convinced by our review of the record that this point is well taken.[4]

 The trial court correctly identified the factors to be considered in determining likelihood of confusion:

 (a) type of trademark, that is, the strength of the prior owner's mark;

 (b) degree of similarity between the two marks;

 (c) similarity between the two products;

 (d) identity of retail outlets and purchasers;

 (e) identity of advertising media utilized;

 (f) defendant's intent;

 (g) actual confusion.

*Armco, Inc. v. Armco Burglar Alarm, Inc.*, 693 F.2d 1155, 1159 (5th Cir.1982). The court then, however, apparently cast aside these factors, holding for defendants because "there is no likelihood of confusion between the Plaintiff's products and Shinohara's printing presses." It is obviously true that no one is likely to confuse a printing press with the equipment used in its operation. It is also irrelevant except as bearing on the third factor to be considered, similarity of products. The "most decisive factor" to the trial court was one that did not appear on the list, the sophistication of the buyers of Shinohara's presses, and the high cost of these presses. Even assuming purchaser sophistication and product cost to be proper subjects of inquiry, it is clearly necessary to consider each with respect to each party's products. Here, the trial court erred by stopping at Shinohara's presses, and by equating the admitted technical sophistication of press purchasers with trademark sophistication. It is well settled that expertise in the field

of trademarks cannot be inferred from expertise in another area. *See, e.g., AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 353 (9th Cir.1979); *Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir.1971); *Communications Satellite Corp. v. Comcet, Inc.,* 429 F.2d 1245, 1252–53 (4th Cir.), *cert. denied,* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970) (collecting cases and authorities); *American Drill Bushing Co. v. Rockwell Manufacturing Co.,* 342 F.2d 1019, 1022, CCPA 1173 (1965); *Koppers Company, Inc. v. Krupp-Koppers GmbH,* 517 F.Supp. 836, 845 (W.D.Pa.1981). (collecting cases).

 We may assume the purchasers of presses to be sophisticated about printing; we may also assume that presses, which cost tens of thousands of dollars, are not bought on impulse, but rather with a great deal of care. We may not assume that these facts are determinative. As stated by the Court of Custom and Patent Appeals, in a case dealing with expensive, complex, and complementary electrical products,

 [We] are of the opinion that the goods are so closely related that purchasers of the respective products could reasonably expect them to have a common source in view of a similarity of the marks. The products are well within the field of electrical apparatus and in some instances devices similar to those manufactured by appellee are used in connection with the various items produced by appellant....

 It is true that in most instances technicians would use the products of either party and they are a discriminating group of people but that does not elimi-

---

4. In this Circuit, a trial court's determination of likelihood of confusion is ordinarily a finding of fact, reviewable under the "clearly erroneous" standard of Rule 52(a), Fed.R.Civ.P. *Louisiana World Exposition v. Logue,* 746 F.2d 1033, 1039 (5th Cir.1984); *compare Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1569 (Fed.Cir.1983) (likelihood of confusion is question of law); *Alpha Industries v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 443–44 (9th Cir.1980) (same); *see also Security Center, Ltd. v. First Nat. Sec. Centers,* 750 F.2d 1295 at 1297 n. 3 (5th Cir.1985). The "clearly erroneous"

rule does not apply, however, to determinations reached by application of an incorrect legal standard. *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.,* 725 F.2d 336, 344 and n. 7 (5th Cir.1984); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 384 (5th Cir.1977); *Continental Motors Corp. v. Continental Aviation Corp.,* 375 F.2d 857, 859 (5th Cir. 1967). Our conclusion that the trial court applied the wrong legal standard in determining likelihood of confusion in this case thus requires us to review its conclusion *de novo.*

nate the likelihood of purchaser confusion here. Being skilled in their own art does not necessarily preclude their mistaking one trademark for another when the marks are similar as those here in issue, and cover merchandise in the same general field.

*Wincharger Corp. v. Rinco, Inc.*, 297 F.2d 261, 264, 49 CCPA 849 (C.C.P.A.1962). *See also Gotrian, Helfferich, Schulz, etc. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir.1975). In *Wincharger* (and in *Gotrian*), the products of both parties were approximately equal in cost and complexity. Here, by contrast, Fuji's graphic arts materials are of negligble cost and complexity when compared with Shinohara's presses. The significance of this difference, overlooked by the trial court, was not lost on Shinohara, which correctly, if perversely, noted that "[t]here is absolutely no evidence in this case to show that a busy printer will bother to investigate any of the supplies which he uses. Accordingly, there is nothing in the record to support the District Court's presumption that commercial printers are expert and sophisticated as to offset plates, cleaning fluids, and other *non-photographic* materials which Plaintiff sells to printers under the 'Fuji' trademark." The trial court neglected this point because it apparently understood "likelihood of confusion" to mean only confusion *by the purchasers of Shinohara's presses* as to the source of those presses. Such is not the case; the broad language of § 1114(1) clearly encompasses confusion on the part of purchasers of *either* (or both) party's products. Moreover, this Court has recognized that an action will lie "when the infringer's use of plaintiff's mark results in confusion as to the origin of *plaintiff's* product." *Capital Films Corp. v. Charles Fries Productions*, 628 F.2d 387, 393 (5th Cir.1980), *quoting Big O Tire Dealers, Inc. v. Goodyear Tire and Rubber Co.*, 561 F.2d 1365, 1371 (10th Cir.1977), *cert. dismissed*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978) (emphasis added); *see Plus ·Products v. Plus Discount Foods, Inc.*, 564 F.Supp. 984, 989 and n. 4 (S.D.N.Y.1983), *modified on other grounds*, 722 F.2d 999 (2d Cir.1983) (recognizing "reverse confusion," 722 F.2d at 1003–04 and n. 6); *compare Victory Pipe Craftsmen, Inc. v. Faberge, Inc.*, 582 F.Supp. 551, 554–56 (N.D.Ill.1984); *Scott v. Mego International, Inc.*, 519 F.Supp. 1118, 1136 n. 21 (D.Minn.1981). Further, and perhaps more important, "likelihood of confusion" may be found absent confusion as to source; trademark infringement occurs also "when the use sought to be enjoined is likely to confuse purchasers with respect to ... [the products'] endorsement by the plaintiff, or its connection with the plaintiff." *Kentucky Fried Chicken*, 549 F.2d at 388, *quoted in Supreme Assembly*, 676 F.2d at 1082. The lack of care with which Fuji's products are purchased, coupled with Fuji's extensive advertising, could clearly conduce to confusion of this sort, yet the trial court apparently did not consider the possibility of its existence.

It is thus clear that the trial court erred in grounding its finding of no likelihood of confusion primarily on the sophistication of printing press purchasers, and on the high cost of printing presses.

▇ The second most important factor to the trial court was its "overwhelming" belief in Shinohara's good faith. This too was error. Good faith is not a defense to trademark infringement. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir.1984); *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1249 (4th Cir.), *cert. denied*, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 158 (9th Cir.), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963); *Best & Co. v. Miller*, 167 F.2d 374, 377 (2d Cir.), *cert. denied*, 335 U.S. 818, 69 S.Ct. 39, 93 L.Ed. 373 (1948). The reason for this is clear: if potential purchasers are confused, no amount of good faith can make them less so. Bad faith, however, may, without more, prove infringement. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.), *cert. denied*, 449 U.S. 985, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). The trial

court thus erred in grounding its finding of no confusion on Shinohara's good faith. As stated by the *Comcet* court, "[w]hile evil intent may evidence unfair competition and deception, lack of guile is immaterial." *Id.*, 429 F.2d at 1249 (citations omitted).

Finally, the trial court appears to have believed that only actual confusion on the part of ultimate purchasers was relevant, and for this reason to have discounted the evidence (and its own findings) of actual confusion on the part of distributors and trade show visitors. This was error as well. Our cases have uniformly recognized evidence of actual confusion as the best evidence of likelihood of confusion. *Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 704 (5th Cir. 1981), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982); *Exxon Corp. v. Texas Motor Exchange*, 628 F.2d 500, 506 (5th Cir.1980); *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 46 (5th Cir.1975); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971). In no case have we sanctioned total disregard of evidence of actual confusion; there is simply no precedent for such a view, regardless of the identity of the person confused. To the contrary, we have stated that "while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *World Carpets*, 438 F.2d at 489. In *World Carpets*, moreover, the actual confusion was engendered in retailers rather than in the ultimate purchasers of carpets. *See also Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 384 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976) and cases cited therein (confusion in consumers can be inferred from confusion in sales clerks); *Dr. Ing. H.C.F. Porsche AG v. Zim*, 481 F.Supp. 1247, 1250 n. 4 (N.D. Tex.1979) (Higginbotham, J.); *Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F.Supp. 555, 561 (S.D.N.Y.1978) (confusion in consumers can be inferred from confusion in plaintiff's distributors); *Waples-Platter Companies v. General Foods Corp.*, 439 F.Supp. 551, 582 (N.D.Tex.1977) (consumer confusion inferred from retailer confusion).

For all of the foregoing reasons, we hold that the trial court used the wrong standard to determine likelihood of confusion. The three factors cited as crucial to its determination were not the proper ones for consideration. A judgment based on a finding "induced by or resulting from a misapprehension of controlling substantive principles" cannot stand. *Continental Motors*, 375 F.2d at 859, *quoting Fulton National Bank v. Tate*, 363 F.2d 562, 567 (5th Cir.1966); *see Sicilia di R. Biebow & Co. v. Cox*, 732 F.2d 417, 431 (5th Cir.1984). The trial court's judgment for Shinohara on Fuji's claim must therefore be reversed.

Our conclusion would be no different were we bound by the "clearly erroneous" rule, for a review of the entire evidence on which the trial court grounded its finding of no likelihood of confusion leaves us "with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), *quoted in Sun Banks of Florida v. Sun Federal Savings & Loan*, 651 F.2d 311, 315 (5th Cir.1981). The factors properly to be considered in determining likelihood of confusion, and their likely application to the facts here, may be summarized as follows.

a) Type of trademark: "FUJI" appears to be a strong mark because it is arbitrary as applied to graphic arts material and because of the lack of evidence of third-party use. *Armco*, 693 F.2d at 1159, and cases cited therein.

b) Degree of similarity between the two marks: they are identical, except that Shinohara uses slanted instead of perpendicular block print. They are, of course, completely identical when heard. *See Dr. Ing. H.C.F. Porsche*, 481 F.Supp. at 1250 (auditory similarity an important factor); *see also Gotrian*, 523 F.2d at 1340 ("trademarks, like small children, are not only seen but heard").

c) Similarity between the two products: they are in some respects complementary; Shinohara's presses are useless without equipment and materials of the sort made by Fuji (among others); some of Fuji's products are useless without an offset press like Shinohara's. Complementary products have been held particularly susceptible to confusion. *See, e.g., In re Martin's Famous Pastry Shoppe, Inc.,* 748 F.2d 1565, 1567 (Fed.Cir.1984) (association of identical trademarks with bread and cheese likely to cause confusion when products not of common origin); *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983) ("the closer the relationship between the products, and the more similar their sales contexts, the greater the likelihood of confusion"); *Comcet,* 429 F.2d at 1253, *citing Aunt Jemima Mills Co. v. Rigney & Co.,* 247 F. 407, 159 CCPA 461 (2d Cir.1917), *cert. denied,* 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1918) (pancake flour and pancake syrup). This is especially true when, as here, the senior user is diversified. *Armco,* 693 F.2d at 1161 ("[d]iversification makes it more likely that a potential customer would associate the non-diversified company's services with the diversified company, even though the two companies do not actually compete").

d) Identity of retail outlets and purchasers: some of the same companies sell presses like Shinohara's and related products like Fuji's. Inasmuch as one party's product is useless without that of the other, the same purchasers obviously buy both.

e) Identity of advertising media utilized: Fuji and Shinohara advertise in the same trade journals. It is all too clear that they advertise at the same trade shows.

f) Defendant's intent: assuming *arguendo* that the trial court was correct in finding Shinohara to have innocent intent, this factor drops out as immaterial.

g) Actual confusion: it is undisputed that both this and the preceding California litigation arose from incidents of actual confusion.

As in *World Carpets,* no evidence has been produced here to "refute the clear inference created by this proof of actual confusion." 438 F.2d at 489. The only factor suggesting support for the trial court's position is that the two products are not identical. The case law, however, has never required identity; widely divergent products have been held subject to confusion. *See, e.g., Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460 (3d Cir.1983) (ceramic insulators/electrical wire); *Armco, Inc. v. Armco Burglar Alarm Co., Inc.,* 693 F.2d 1155 (5th Cir.1982) (industrial steel producer/burglar alarm installer); *Visa International Service Assoc. v. Visa Hotel Group, Inc.,* 561 F.Supp. 984 (D.Nev.1983) (financial services/hotels); *Lambda Electronics Corp. v. Lambda Technology, Inc.,* 515 F.Supp. 915 (S.D.N.Y.1981) (manufacture of electronic power supplies and power semiconductors/design of computer software); *Comcet, supra* (satellites/computers). *See also Boston Professional Hockey Assoc. v. Dallas Cap & Emblem Manufacturing, Inc.,* 510 F.2d 1004, 1012 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Neither Shinohara nor the trial court cites any case in which no likelihood of confusion was found as to products useless without each other, bearing the same mark, advertised in the same media, sold by the same sellers to the same buyers, and as to which there has been undisputed actual confusion. We have found no such cases either, and therefore hold the trial court's finding of no likelihood of confusion to be clearly erroneous.

*The California Judgment*

■ Fuji contends that the trial court erred in refusing to accord the California consent decree *res judicata* or collateral estoppel effect; it is unnecessary to deal with this point in great detail because of the conclusions reached above. Shinohara was not a party to the California litigation; therefore, the consent decree could be *res judicata* as to Shinohara only if Sundman, the actual party defendant, was in privity with Shinohara or its virtual representa-

tive. *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 339–41 (5th Cir.1982). The trial court's finding that Sundman was not the virtual representative of Shinohara is one of fact, to be reviewed under the "clearly erroneous" standard. *Aero-jet General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975). Although we entertain grave doubts as to this finding, given the contractual relationship between the parties and undisputed evidence of communications concerning the litigation, we do not believe it to be clearly erroneous. The decision of the trial court to refuse the California judgment *res judicata* effect is therefore affirmed.

We note, however, that the consent decree entered by the California court fulfilled the requirement set forth in *Kaspar Wire Works, Inc. v. Leco Engineering and Machinery*, 575 F.2d 530, 542 (5th Cir. 1978), that "a consent decree is not issue preclusive, *i.e.*, does not act as collateral estoppel, in the absence of clear evidence concerning the parties' intention, including specific reference to the issues that it was intended to preclude." It is quite clear that the parties to the California consent decree intended it to preclude further litigation of Fuji's exclusive right to the "FUJI" trademark applied to graphic arts materials.[5]

### Foreign Trademark Usage

Fuji correctly assigns as error the trial court's admission of evidence of the parties' foreign trademark usage and occurrences. The concept of territoriality is basic to trademark law;[6] trademark rights exist in each country solely according to that country's statutory scheme. *Ingenohl v. Walter E. Olsen & Co.*, 273 U.S. 541, 544, 47 S.Ct. 451, 452, 71 L.Ed. 762 (1927). "It is well settled that foreign use is ineffectual to create trademark rights in the United States." *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1270 n. 4 (2d Cir.1974) (citation omitted); *accord, Johnson & Johnson v. Diaz*, 339 F.Supp. 60, 63–64 (C.D.Cal.1971), *citing, inter alia, Le Blume Import Co. v. Coty*, 293 F. 344 (2d Cir.1923). It is equally well settled that "when trade-mark rights within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trade-mark rights of the parties are irrelevant and inadmissible." *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir.), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956), citing *George W. Luft Co. v. Zande Cosmetic Co.*, 142 F.2d 536, 539 (2d Cir. 1944); *accord, Carl Zeiss Stiftun v. VEB Carl Zeiss Jena*, 433 F.2d 686, 697 (2d Cir.), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). These cases are perfectly good law; despite the absence of

---

**5.** The California consent decree contained, *inter alia*, the following statements:

(2) Plaintiff's Federal trademark registrations as specified in paragraph 9 of the complaint, Reg. Nos. 598,938; 614,791; 625,308; 689,864; 902,593; 904,287; 925,805; 928,257; 932,563; and 932,564 were duly and legally issued to plaintiff, and plaintiff was at the time of filing of this action and still is the owner of said trademark registrations. Moreover, plaintiff is the owner of the trademark FUJI as applied to graphic arts equipment and materials.

(3) Defendant, Fuji Graphics, Inc., admits the validity of said trademark registrations and the note of infringement of said registrations as stated in Count 1 of the complaint and admits further infringement of the trademark FUJI as applied to graphic arts equipment and materials.

\*　　\*　　\*　　\*　　\*　　\*

(6) Defendant, Fuji Graphics, Inc., its officers, agents, servants, employees, attorneys, and any and all persons in active concert or participation with it, are permanently enjoined from the distribution, advertising, use, and/or sale of products bearing or including the name FUJI or any name or mark confusingly similar thereto in connection with any graphic arts equipment or materials or any other products likely to be associated as to source or origin with graphic arts equipment or materials and is further enjoined from the use of the trade name "Fuji Graphics, Inc.", or any other name in which the word FUJI or any other name similar thereto appears.

**6.** *See generally* Reichman, *Design Protection in Domestic and Foreign Copyright Law: From the Berne Revision of 1948 to the Copyright Act of 1976*, 1983 Duke L.J. 1143, 1162–65, 1197.

comparable authority from this Circuit, their reasoning, and general principles of trademark law, compel the conclusion that it was error to admit evidence of the parties' foreign trademark practices.

### Shinohara's Counterclaim

■ Shinohara contends that the trial court correctly found no likelihood of confusion between Fuji's products and its presses, but erred in finding no likelihood of confusion between Shinohara's presses and Fuji's products. This remarkable argument is premised on Shinohara's assertion of prior use of the "FUJI" mark on graphic arts materials, as evidenced by one sale of one non-offset press in Okinawa in 1967, during the United States occupation of that island. Shinohara claims that the occupation of Okinawa by the United States rendered Okinawa a part of the United States, and that its sale of one press in Okinawa was therefore a use in commerce in the United States within the meaning of § 1127 of the Lanham Act. Shinohara has provided no support for this proposition and we have found none; the question of Okinawa's status under the Lanham Act during the relevant period appears to be one of first impression.

We are not, however, totally without guidance. During the American occupation, but before the signing of the peace treaty with Japan in 1952, the Ninth Circuit held Okinawa to be a "foreign country" for purposes of the Federal Tort Claims Act, 28 U.S.C.A. §§ 2671–2680. *Cobb v. United States,* 191 F.2d 604 (9th Cir.1951), *cert. denied,* 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952). Six years later, with the occupation still in force but after the signing of the peace treaty, the Fourth Circuit also held Okinawa to be a foreign country under the FTCA. *Burna v. United States,* 240 F.2d 720 (4th Cir.1957). The *Burna* court quoted the statement of John Foster Dulles, United States delegate to the Japanese Peace Conference:

Several of the Allied Powers urged that the treaty should require Japan to renounce its sovereignty over these islands in favor of United States sovereignty. Others suggested that these islands should be completely restored to Japan.
*In the face of this division of Allied opinion, the United States felt that the best formula would be to permit Japan to retain residual sovereignty....*

240 F.2d at 721 (emphasis added).[7] Both *Burna* and *Cobb* (Pope, J., concurring) quoted language from *Hichino Uyeno v. Acheson,* 96 F.Supp. 510, 515 (W.D.Wash. 1951):

[I]t is obvious that the words "foreign state" are not words of art. In using them, the Congress did not have in mind the fine distinctions as to sovereignty of occupied and unoccupied countries which authorities on international law may have formulated. They used the word in the sense of "otherness". When the Congress speaks of "foreign state", it means a country which is not the United States or its possession or colony,—an alien country,—other than our own, bearing in mind that the average American, when he speaks of a "foreigner" means an alien, non-American.

\* \* \* \* \* \*

So here, the interpretation called for is that of common speech and not that derived from abstract speculation on sovereignty as affected by foreign military occupation.

In *Rose v. McNamara,* 375 F.2d 924 (D.C. Cir.), *cert. denied,* 389 U.S. 856, 88 S.Ct. 70, 19 L.Ed.2d 121 (1967), the District of Columbia Circuit similarly rejected the notion of Okinawa as part of the United States, explaining the relationship as follows:

[W]e have, vis-a-vis Okinawa, been a most reluctant conqueror indeed. In the Treaty of Peace with Japan we signified our purpose not to hold Okinawa as a United States possession but to put it in due course under the United Nations trusteeship system. More latterly it has

---

7. Okinawa was returned to Japan on May 15, 1972. *Roberts v. United States,* 498 F.2d 520,

523 n. 2 (9th Cir.), *cert. denied,* 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974).

become a stated objective of our international policy to restore Okinawa to Japan.

In the Executive Order issued in implementation of the Peace Treaty, President Eisenhower declared at the outset the amenability of its provisions to action by Congress. Congress has, however, remained content for a decade to allow Okinawa to be governed under the terms of the Order. The reasons for this inaction are not hard to divine. They reflect what appears to be a national consensus that our possession of Okinawa is, by our own design, temporary; and that a wise concept of our foreign relations points in the direction of its being returned, sooner rather than later, to a Japan which has, in no small part because of a host of similar forbearances on our part, become a strong bulwark of the free world in the Far East. In this posture, when our friends in Japan look expectantly to an early restoration of these islands, the assertion by Congress of its authority to create permanent and detailed laws for the government of the Ryukyus would be as impolitic as it would, hopefullly [sic], be short-lived and thereby wasteful of Congressional energies.

375 F.2d at 928 (footnotes omitted). The *Rose* court further noted that

President Kennedy, in a statement to accompany Exec. Order No. 11010, March 16, 1962, which amended President Eisenhower's original order setting

up the Government of the Ryukyus, declared it to be the public policy of the United States that we recognize the Ryukyus as "a part of the Japanese homeland and look forward to the day when the security of the Free World will permit their restoration to full Japanese sovereignty." 1962 Public Papers of the Presidents 247–48. For similar statements, see 48 Dep't State Bull. 770 (1962) (referring to "the anticipated eventual restoration of these islands to Japanese administration"); 45 Dep't State Bull. 57–58 (1961); 37 Dep't State Bull. 52 (1957).

*Id.* at n. 7. We are persuaded by these cases, and by the authoritative statements on which their holdings were grounded, that the United States did not encompass Okinawa in 1967 for purposes of the Lanham Act.[8] Shinohara's sale of a press trademarked "FUJI" in Okinawa in 1967 was not, therefore, a use in commerce in the United States; it did not and could not establish Shinohara as the prior user of the "FUJI" mark here.[9] The trial court's judgment that Shinohara take nothing by its counterclaim was thus correct, and we affirm it.

### Attorneys' Fees

Under § 1117 of the Lanham Act, attorneys' fees may be awarded in an "exceptional case." Shinohara contends that this was such a case, and that the trial court erred in denying it attorneys' fees. Shino-

---

8. This conclusion is buttressed by trademark practice in Okinawa at the time in question. Those wishing to register trademarks in Okinawa during the American occupation did so through a special office established for that purpose in Okinawa, rather than through the United States Patent and Trademark Office. At the close of the American occupation, all trademarks so registered were transferred to the Japanese Trademark Office in Tokyo. We are indebted to Ms. Cathy Blowers of the Embassy of Japan for this information, which seems clearly to indicate that no United States trademark rights were created by trademark usage in Okinawa.

9. In any event, it is far from clear that one United States sale, not followed by another for eleven years, would be sufficient to create Unit-

ed States trademark rights. The "token use" doctrine might well preclude a claim of prior use in these circumstances. *See, e.g., Ralston Purina Co. v. On-Cor Frozen Foods, Inc.,* 746 F.2d 801, 804 (Fed.Cir.1984); *Exxon Corp. v. Humble Exploration Co.,* 695 F.2d 96, 99–100 (5th Cir.1983); *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1271–72 (2d Cir.1974); *cf. Stern Electronics, Inc. v. Kaufman,* 669 F.2d 852, 857 (2d Cir.1982).

Moreover, were we to hold the Okinawa sale a use in commerce in the United States, and the "token use" doctrine inapplicable to it, Fuji's continuous use of the trademark "FUJI" on graphic arts materials in the territorial United States since 1964 would yet appear to defeat Shinohara's claim of prior use.

hara's contention is without merit. A trademark holder is required to police his mark; else, it may become generic,[10] diluted, or otherwise lessened in value. The trial court found that Fuji acted in good faith in bringing this action; its finding was clearly correct. The trial court's denial of attorneys' fees to Shinohara was thus correct as well, and we affirm it.

The judgment of the trial court for defendant-appellee Shinohara on plaintiff-appellant Fuji's claim is REVERSED, and the cause is REMANDED for further proceedings consistent with this opinion. The judgment of the trial court as to Shinohara's counterclaim and request for attorneys' fees is AFFIRMED.

REVERSED in part, AFFIRMED in part, and REMANDED.

---

10. The classic case on this point is *Bayer Co. v. United Drug Co.,* 272 F. 505 (S.D.N.Y.1921). *See* Note, *Trademarks and Generic Words,* 51 U.Chi. L.Rev. 868, 872 n. 25 (1984) and cases cited therein.