IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 15, 2009

Charles R. Fulbruge III
Clerk

No. 08-20578

XTREME LASHES, LLC; JOUMANA MOUSSELLI

Plaintiffs–Appellants

v.

XTENDED BEAUTY, INC.

Defendant–Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before BARKSDALE, DeMOSS, and STEWART, Circuit Judges.

DeMOSS, Circuit Judge:

This dispute concerns trademarks for eyelash extensions. We hold that the district court incorrectly granted summary judgment to Defendant-Appellee Xtended Beauty, Inc. ("Xtended") on infringement claims by Plaintiffs-Appellants Xtreme Lashes, LLC and Joumana Mousselli (collectively "Xtreme"). We also hold that the district court incorrectly stripped Xtreme's mark EXTEND YOUR BEAUTY of trademark protection. We reverse and remand for trial.

I.

Xtreme and Xtended sell kits used by professional cosmetologists to lengthen and accent clients' eyelashes. Xtreme has used the marks XTREME LASHES and EXTEND YOUR BEAUTY since September 10, 2005. Xtreme

obtained federal registration of EXTEND YOUR BEAUTY on October 23, 2007, and registration of XTREME LASHES on April 1, 2008. XTREME LASHES appears on all or nearly all of Xtreme's products. The mark features a large X, half of which is formed by a stylized eyelash. The type-written mark EXTEND YOUR BEAUTY appears on some products as well, but always in conjunction with XTREME LASHES. Xtreme has spent $1.3 million to promote its products via direct mail campaigns, trade shows, magazines (including *American Spa*, *Beauty Launchpad*, and *Skin, Inc.*), and the Internet. Xtreme sells directly to licensed health and beauty professionals (e.g., cosmetologists, doctors and nurses), as well as to prominent but unlicensed professionals (e.g., make-up artists). Xtreme holds training workshops, for which the participant normally pays between $695 and $900. Only those who complete a workshop and receive Xtreme's certification may buy its products. Xtreme sells a "gold" and a "platinum" kit, which cost $529 and $949, respectively. Each kit comes in a silver carrying case which bears the XTREME LASHES mark.

Xtended has used XTENDED BEAUTY on its products since July 29, 2006. The mark features a large, type-written X. Xtended mainly sells to distributors, who then sell to beauty professionals. Xtended markets its products via trade shows, trade publications (including *The Green Book* and *American Beauty*), and the Internet. Xtended sells eyelash kits for $345; the kits come in a silver carrying case which features the XTENDED BEAUTY mark. Beauticians must receive training, either from Xtended or another company, before purchasing a kit. Xtended's training is normally free.

Xtreme alleged that Xtended has infringed and diluted its marks.[1] Xtended counterclaimed, seeking cancellation of EXTEND YOUR BEAUTY. Per the district court's order, the parties filed a joint trademark chart. Before the

---

[1] Xtreme also alleged in the district court that Xtended infringed the mark XTREME BEAUTY, which Xtreme has registered but never used. That issue is not before us.

parties conducted discovery, Xtended moved for summary judgment on all claims. In support of its motion, Xtended filed a declaration and report by Dr. Robert Frank, a specialist in trademark searches. After conducting database research, Dr. Frank found that "xtreme" (in its misspelled form) is a common term in the beauty industry. Dr. Frank also found that "extend your beauty" was used by at least thirty companies world-wide to describe or market personal grooming products, including eyelash products and services. In response, Xtreme demonstrated that many of the sellers of eyelash extensions in the United States using the phrase "extend your beauty" were licensees of Xtreme.

After conducting a hearing, the court held that no reasonable person would likely confuse either of Xtreme's marks with XTENDED BEAUTY because the marks were so dissimilar. Without a written statement of reasons, the court entered summary judgment in favor of Xtended on trademark infringement and dilution claims. At a later hearing, the court found EXTEND YOUR BEAUTY descriptive as a matter of law. The court ordered the mark cancelled. The court dismissed other claims as moot and entered final judgment. Xtreme appealed, seeking reversal of the adverse judgments.

## II.

We review a district court's grant of summary judgment de novo. *Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008) (citation omitted). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "[W]e are obliged to construe all the evidence and reasonable inferences deduced therefrom in a light most favorable to [Xtreme], the nonmoving party in the court below." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1260 (5th Cir. 1991).

In a trademark infringement action, the paramount question is whether one mark is likely to cause confusion with another. *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985). "Likelihood of confusion" means more than a mere possibility; the plaintiff must demonstrate a probability of confusion. *Smack Apparel*, 550 F.3d at 478. We examine the following nonexhaustive "digits of confusion" in evaluating likelihood of confusion: (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers. *Id.* No digit is dispositive, and the digits may weigh differently from case to case, "depending on the particular facts and circumstances involved." *Marathon*, 767 F.2d at 218. The court should consider all relevant evidence. *Id.* at 219. While likelihood of confusion is typically a question of fact, summary judgment is proper if the "record compels the conclusion that the movant is entitled to judgment as a matter of law." *Smack Apparel*, 550 F.3d at 474. We first consider likelihood of confusion between XTENDED BEAUTY and XTREME LASHES. We then ask whether EXTEND YOUR BEAUTY is a protectable mark, and if so, whether confusion is likely between it and XTENDED BEAUTY.

A. XTREME LASHES

*Type of trademark.* "Type of trademark" refers to the strength of the senior mark. *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998). Stronger marks are entitled to greater protection. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir. 1980). Marks are normally assigned to "categories of generally increasing distinctiveness": (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Id.* A generic term refers

to the class of which a good is a member. *Id.* A descriptive term provides an attribute or quality of a good. *Id.* at 769. Generic terms receive no trademark protection, while descriptive terms merit protection only if they have secondary meaning. *Id.* A suggestive terms suggests, but does not describe, an attribute of the good; it requires the consumer to exercise his imagination to apply the trademark to the good. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 791 (5th Cir. 1983). More distinctiveness and less natural or literal content correspond with increased mark strength. *See Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 504 (5th Cir. 1980). It is proper to give more weight to distinctive portions of a mark and less weight to unremarkable or generic portions. *See In re Dixie Rests., Inc.*, 105 F.3d 1405, 1407 (Fed. Cir. 1997). "Any given term's correct classification is a factual issue." *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 n.12 (5th Cir. 1980) (citations omitted).

The district court did not determine whether the mark XTREME LASHES is weak or strong. Xtreme does not contend that the mark has secondary meaning; thus, it is protectable only if it is suggestive, fanciful, or arbitrary. Plainly, the mark as a whole is not generic (e.g., "eyelash extensions"), despite the inclusion of the term "lashes." *See In re Dixie Rests.*, 105 F.3d at 1407. Viewing evidence in the light most favorable to Xtreme, we believe that XTREME LASHES "arguably has many of the indicia of a suggestive mark and is therefore entitled to protection." *See Sun-Fun Prods., Inc. v. Suntan Research & Dev. Inc.*, 656 F.2d 186, 191 n.5 (5th Cir. Unit B Sept. 1981). The consumer must exercise some imagination to associate "xtreme lashes" with "artificially elongated eyelashes." *See Zatarains*, 698 F.2d at 791. The mark uses a misspelling of the word "extreme" and a stylized eyelash forms part of the "X." *Cf. Soweco*, 617 F.2d at 1186 n.24 (noting that a misspelling alone does not make an otherwise generic term protectable). Xtended showed that the term "xtreme" appears frequently on cosmetics and grooming products. *Cf. Amstar*, 615 F.2d

at 259-60 (holding that widespread use of DOMINO across many industries weighed against mark strength). However, this prevalence should be weighed by a jury. There is no evidence that other sellers of eyelash products use the term "xtreme." We cannot say with certitude that XTREME LASHES is strong or weak. For summary judgment purposes, the mark is entitled to protection.

*Mark similarity.* Mark similarity "is determined by comparing the marks' appearance, sound, and meaning." *Capece*, 141 F.3d at 201. "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features." *Amstar*, 615 F.2d at 260-61 (quotation omitted). Nevertheless, courts should give more attention to the dominant features of a mark. *See Capece*, 141 F.3d at 202. Even if two marks are distinguishable, we ask whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association. *See id.* at 201. To determine the "meaning and connotation" of the marks, we consider the context of use, such as labels, packaging, and advertising. *Id.* (quotation omitted). "The two marks must bear some threshold resemblance in order to trigger inquiry into extrinsic factors, but this threshold is considerably lower than the degree of similarity required where the plaintiff presents little or no evidence on extrinsic factors supporting infringement." *Sun-Fun*, 656 F.2d at 189.

XTREME LASHES and XTENDED BEAUTY have no common words and use different typefaces. Each mark has two words, but there is minor aural similarity when the marks are spoken aloud. Both marks suggest cosmetic enhancement. Two color schemes are used for each mark (white lettering/black background and black lettering/white background for XTREME LASHES, and white lettering/black background and white lettering/azure background for XTENDED BEAUTY). Thus, both marks have employed white lettering on a black background. Both marks also use a large stylized 'X' as a prominent

feature of the mark. Xtreme's letter X is formed in part by a golden eyelash, while Xtended's X uses regular typeface. Both marks use the X in an eye-catching misspelling. Moreover, the marks appear in similar contexts. Each appears upon a silver carrying case for the companies' kits, as well as on the products inside the kits. The companies use similar marketing channels to promote the marks.

Focusing on the marks' distinct terms and typefaces, the district court concluded that no reasonable person could be confused. The court in essence held that there was too little "threshold resemblance" to engender any likelihood of confusion. *See id.* at 189. We disagree. A focus on the marks' distinguishable visual features, when viewed "side by side in the judicial solemnity of the courtroom is by itself enough of a falsification of actual market conditions to defy realistic appraisal." *Id.* (quotation omitted). While a large X alone should not be protectable, it is a visually striking common feature integrated into both marks. *See id.* at 190 (holding that use of a sunburst in a similar format, despite dissimilar brand names and stylistic features, created question of fact); *cf. Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 504 (5th Cir. 1979) (no likelihood of confusion where term WORLD was prominent feature of senior mark but "diminutive" feature in junior mark).

Taking all inferences in favor of Xtreme, we believe that the marks are similar enough to suggest a common origin or association—especially because several other "digits" weigh towards confusion. *See Sun-Fun*, 656 F.2d at 189. Even if a person recognized that the marks are not identical, she might believe that XTENDED BEAUTY is a product line offered by the makers of XTREME LASHES, such as a discount line. Confusion of origin, not the identity of marks, is the gravamen of trademark infringement. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004). The marks also appear in near-identical contexts on the companies' kits. For this reason, we find Xtended's

7

assertion unpersuasive that reversing the district court would allow Xtreme "to preclude anyone that uses a Big X to promote eyelash extension and related products." Ultimately, "[a] jury might well conclude that the marks are too dissimilar to justify a finding of infringement. We merely hold that it was improper for the district judge to weigh these similarities and differences instead of the jury." *See Sun-Fun*, 656 F.2d at 190.

*Product similarity*. "The greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon*, 628 F.2d at 505. Xtreme and Xtended peddle kits which include eyelash extensions, adhesive, special scissors, and other accouterments needed to affix, touch up, or remove fake eyelashes. Both kits come in a silver case bearing the respective mark. This factor weighs in favor of likelihood of confusion.

*Outlet and purchaser identity*. Xtreme sells to health and beauty professionals who meet in-house training and certification requirements. Xtended sells to beauty distributors, which in turn sell to cosmetologists and other professionals. Buyers cannot "compare the products side by side," which "may increase the likelihood of confusion." *See Sun-Fun*, 656 F.2d at 192. Ultimately, both companies seek to land their kits in the hands of trained cosmetologists, and have their products affixed to customers' lashes. This supports an inference that Xtended and Xtreme compete directly for end-users in the eyelash extension market. This factor favors Xtreme.

*Advertising media identity*. Both companies use print advertisements, direct mailings, and Internet promotion. The parties do not advertise in identical magazines, but they target the same class of buyers. This supports an inference that the parties use similar advertising and marketing channels.

*Defendant's intent*. A junior user must avoid choosing a mark which may cause confusion with the senior user's mark. *See in re Shell Oil Co.*, 992 F.2d

1204, 1209 (Fed. Cir. 1993). However, with no evidence of Xtended's intent, this factor is neutral. *See Capece*, 141 F.3d at 203.

*Actual confusion*. Actual confusion need not be proven, but if consumers have confused the junior mark for the senior mark, this is "the best evidence of a likelihood of confusion." *Smack Apparel*, 550 F.3d at 483. "Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971).

Xtreme showed several incidences of confusion. For instance, Lisa Flowe, a cosmetologist licensed for 26 years, stated in an affidavit that in 2007 she tried to buy Xtreme's kit. Flowe knew of Xtreme but never purchased its products: "When I saw a picture in the catalogue of an eyelash extension kit with a name that begins with 'X,' I assumed it was the Xtreme Lashes product I was looking for." She ordered the kit and contacted a salon affiliated with Xtreme, seeking to obtain training. Later she realized that she bought the wrong kit. Before the entry of summary judgment, Xtreme presented evidence that two other customers were confused, one of whom, like Flowe, actually purchased Xtended's kit but thought she had purchased Xtreme's kit.[2]

Despite this evidence, the district court reasoned: "occasional confusion is not the same thing as market confusion." The court noted that some people might say Bloomingdale's when they mean Neiman Marcus, or Pepsi instead of Coke. Because the court considered the marks so distinct, it reasoned that any confusion was irrational. In this vein, Xtended argues that "isolated anecdotes of purchaser confusion do not constitute actual confusion." The only case from

---

[2] After the district court's grant of summary judgment, Xtreme moved for reconsideration and presented evidence that three more people had experienced confusion. Even without considering this evidence, we conclude that there is a genuine issue of fact.

this Court cited by Xtended is *First Southern Federal Loan & Savings Association of Mobile, Alabama v. First Southern Savings & Loan Association of Jackson County, Mississippi* (*First Southern*), 614 F.2d 71 (5th Cir. 1980). Xtended misinterprets *First Southern*. There, we reviewed a bench trial in which the court denied the senior user relief, despite actual confusion. *Id.* at 72-73. We applied Mississippi law, not the Lanham Act, and found the senior mark unprotectable. *Id.* at 74. We held that it was not clear error to find that the marks "were not so similar as to be reasonably calculated to deceive the public and injure the appellant." *Id.* (citations omitted). *First Southern* applied a different standard of review, body of law, and legal test. It contributes nothing to this dispute.

The evidence of confusion in this case creates a genuine issue of material fact. While summary judgment may be appropriate in outlier cases, *see, e.g.*, *Smack Apparel*, 550 F.3d at 483, courts may not ignore competent evidence of actual confusion, *see Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985) ("In no case have we sanctioned total disregard of evidence of actual confusion; there is simply no precedent for such a view . . . ."). The evidence shows more than a fleeting mix-up of names. It shows actual confusion about the origin of the parties' products. The confusion was caused by the trademarks employed and it swayed consumer purchases. *See Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004) ("To prove infringement, [plaintiff] must ultimately prove that a misleading representation by [defendant], as opposed to some other source, caused a likelihood of confusion."). This evidence is highly probative of infringement. *See World Carpets*, 438 F.2d at 489; *Louisiana World Expo., Inc. v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984) (holding that single known incidence of confusion by purchaser supported bench trial finding of likelihood of confusion). To ignore this

evidence as anecdotal or irrational tramples upon the province of the trier of fact.

Xtended does not persuade when it insinuates that confusion was due to inattentiveness or similarity of trade dress. Nothing proves that Flowe and other consumers haphazardly mixed up XTREME LASHES and XTENDED BEAUTY. To so presume, in favor of Xtended, is verboten. Furthermore, if the marks' appearance on similar silver kits confuses consumers, this shows that the marks appear in confusingly similar contexts—weighing in Xtreme's favor. Xtended has it backwards to say otherwise. The evidence may not be overwhelming. A jury could find that Flowe and the other confused consumers were careless. However, it bears emphasizing that the evidence on record is only from those individuals who conveyed their confusion to Xtreme. We cannot assume that these known incidents of confusion prove a negative, namely, a paucity of confusion by all others. Discovery and a survey should illuminate actual or potential confusion. *See Exxon*, 628 F.2d at 506-07; *Zatarains*, 698 F.2d at 793 n.4. We reiterate that Xtreme only needed to show a genuine issue as to *likelihood* of confusion. Xtreme has gone beyond this requirement, and shown true confusion in the marketplace. This factor weighs strongly in Xtreme's favor.

*Care exercised by potential purchasers.* "Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Smack Apparel*, 550 F.3d at 483; *see also Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173-74 (5th Cir. 1986) (reasoning that because purchasers were "buying for professional and institutional purposes at a cost in the thousands of dollars, they are virtually certain to be informed, deliberative buyers") (citation omitted). However, a high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar. *See Fuji*, 754 F.2d at 595-96.

Xtreme presented an affidavit by Martin Dale, a co-owner and director of Xtreme, who stated that in his experience, the purchasers of eyelash kits, while experienced or licensed estheticians, are often young, "very impressionable," and impetuous in their purchasing behavior. Xtreme also points to the affidavit of Lisa Flowe as evidence that buyers are not always informed or careful. Despite decades of experience as a cosmetologist and an intent to buy Xtreme's kit, Flowe did not bat an eyelash before spending over $300 on Xtended's kit. Flowe did not realize her mistake until after she had called an Xtreme affiliate for customer support and training. Xtended argues that the high price of Xtreme's kits ($529 for the "gold" kit, $949 for the "platinum"), and the requirement that purchasers be trained professionals, impel the conclusion that customers exercise great care when buying the kits. After an esthetician undergoes training on Xtreme's products, it is logical to say that confusion is less likely. However, this does not prevent confusion by untrained buyers, like Lisa Flowe, seeking to extend their repertoire to this up-and-coming product. Whether Flowe's case is aberrational or indicative of typical market reaction cannot be adjudicated at this stage. We therefore infer that this factor favors Xtreme.

*Conclusion / weighing of digits.* For summary judgment purposes, all digits of confusion are either neutral or weigh in Xtreme's favor. Actual confusion weighs strongly in Xtreme's favor. No factor favors Xtended. Considering the record in the light most favorable to Xtreme, we cannot say that judgment for Xtended is "preordained." *See Soc'y of Fin. Examiners v. Nat'l Ass'n of Certified Fraud Examiners, Inc.*, 41 F.3d 223, 226 (5th Cir. 1995). We therefore reverse the district court's grant of summary judgment.

## B. EXTEND YOUR BEAUTY

The district court held that, as a matter of law, there was no likelihood of confusion between EXTEND YOUR BEAUTY and XTENDED BEAUTY. Later, the court ordered the mark cancelled. We first ask if EXTEND YOUR BEAUTY

is entitled to trademark protection. We hold that it is, and then ask if summary judgment was appropriate on likelihood of confusion. We hold that it was not.

*1. Trademark Protection*

A trademark registration by the Patent and Trademark Office (PTO) is "prima facie evidence of the validity of the registered mark . . . ." 15 U.S.C. § 1115(a). However, if the mark is found to be either generic or descriptive and lacking secondary meaning, a court may cancel it. 15 U.S.C. § 1119; *see Soweco*, 617 F.2d at 1184 (holding that registration does not bar defenses to infringement). Because categorization is a question of fact, summary judgment is rarely appropriate. *Soweco*, 617 F.2d at 1183 n.12; *see also Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.* (*Union Nat'l*), 909 F.2d 839, 845 n.13 (5th Cir. 1990) ("[I]t will be the exceptional case which may be disposed of on these grounds."). Xtreme does not argue that EXTEND YOUR BEAUTY has secondary meaning. Consequently, the mark must be at least suggestive to be protectable. *See Two Pesos*, 505 U.S. at 768-69.

Descriptiveness is construed broadly. *See Zatarains*, 698 F.2d at 792. Indicia include: (1) the mark's dictionary definition corresponds with its meaning and context; (2) upon hearing the mark, one need not use "imagination, thought and perception to reach a conclusion as to the nature of goods;" (3) "competitors would be likely to need the terms used in the trademark in describing their products;" and (4) others have used the term in marketing a similar service or product. *Id.* at 792-93 (quotations and citations omitted). We examine the context in which a term appears, and the audience to which it is directed, when determining eligibility for protection. *Union Nat'l*, 909 F.2d at 846-47. We also look at a multi-word mark as a unitary whole in its given arrangement, and do not parse apart the constituent terms. *Id.* at 848 n.25. Because we are reviewing a grant of summary judgment, we make all reasonable inferences in favor of Xtreme, the non-moving party. *See Int'l Shortstop*, 939 F.2d at 1260.

13

The district court held that EXTEND YOUR BEAUTY is descriptive as a matter of law. Xtended's expert, Dr. Frank, found that EXTEND YOUR BEAUTY is not used as a company name, nor as product name or trademark. Dr. Frank found that thirty companies had used the phrase in conjunction with hair care, eyelash, or personal grooming products and services. Dr. Frank also found that the phrase appears in non-trademark contexts. Xtreme insists that there is a question of fact whether EXTEND YOUR BEAUTY is suggestive. The fact that the PTO registered the mark, says Xtreme, alone precludes summary judgment. Xtreme next argues that others' use of "extend your beauty" in a textual sense or in conjunction with non-eyelash related beauty products should not weigh in favor of descriptiveness. Xtreme also says "nearly every seller identified by Xtended in the eyelash extension industry is a client of Xtreme and is using the EXTEND YOUR BEAUTY trademark with its permission."

Xtreme has the better argument. The tests posited in *Zatarains* mainly point to suggestiveness. *See* 698 F.2d at 792-93. "Extend" describes a function of the product, but nothing in the dictionary definitions of "extend," "your," or "beauty" relates to *eyelash* enhancements. Beauty is an abstract concept. One cannot literally extend it. The district court observed that beauty serves as a metaphor for eyelashes. We agree, but unlike the district court, we conclude that metaphorical usage means the mark is arguably suggestive. The mark's meaning and context have little to do with the dictionary definitions of its parts. The three-word mark, viewed as a whole, has no dictionary meaning or idiomatic resonance. Additionally, consumers must use "imagination, thought and perception" to conclude that an exhortation to "extend your beauty" markets *eyelash* extensions, as opposed to another cosmetically enhanced feature. *See id*. It is worth noting that EXTEND YOUR BEAUTY always appears in conjunction with XTREME LASHES. Use in this context may explain the nature of the product, weighing towards descriptiveness. However, this is a matter best

14

weighed by a jury after a full presentment of the evidence. *See Union Nat'l*, 909 F.2d at 845 n.13.

As for other indicia of descriptiveness, nothing in the record shows that makers of eyelash extensions need the phrase "extend your beauty" in order to describe their products. *See Zatarains*, 698 F.2d at 792-93. Third-party use for unrelated products is not relevant when evaluating descriptiveness. *See Union Nat'l*, 909 F.2d at 848. Companies which have used EXTEND YOUR BEAUTY for eyelash products have done so mainly as licensees of Xtreme. A non-affiliated company called Luscious Lashes apparently has used the phrase to sell eyelash products or services, but this evidence alone does not entitle Xtended to judgment. A phrase is not descriptive merely because it is catchy.[3] *See Smack Apparel*, 550 F.3d at 488 ("[T]he fact that a trademark is desirable does not, and should not, render it unprotectable.") (quotation omitted); *Union Nat'l*, 909 F.2d at 848 n.22 ("The *need* to use a term because it is generic or highly descriptive should be distinguished from the *desire* to use it because it is attractive.") (emphasis in original). Finally, words such as "extend" and "beauty" may be common in advertisements and trademarks. However, the ubiquity of constituent terms does not relegate a compound mark to the realm of the descriptive. "Just," "do," and "it" are very common, but Nike can still trademark "Just Do It." In sum, the evidence does not compel the conclusion that EXTEND YOUR BEAUTY is descriptive and unprotectable. We reverse the district court's cancellation of the mark, and now consider likelihood of confusion with XTENDED BEAUTY.

---

[3] Because the evidence does not compel the conclusion that Xtreme's mark is descriptive, we need not consider whether the district court erred in *sua sponte* conducting an Internet search for third-party use of the mark.

*2. Likelihood of Confusion*

Applying the eight digits of confusion, *see Smack Apparel*, 550 F.3d at 478, we conclude that there is an issue of fact of likelihood of confusion between EXTEND YOUR BEAUTY and EXTENDED BEAUTY.

*Type of trademark*. As discussed above, EXTEND YOUR BEAUTY is arguably suggestive. The mark hints at the genus to which the product belongs (cosmetics), but does not indicate its species (eyelash extensions). Xtended presented evidence that the phrase appears with some frequency in marketing or text in conjunction with beauty products. Whether it is so common that consumers will not associate it with a particular company is for a jury to decide. For summary judgment purposes, this factor favors Xtreme.

*Mark similarity*. The marks EXTEND YOUR BEAUTY and XTENDED BEAUTY have several common elements. Both contain the term beauty as well as some form of the word extend—albeit Xtreme spells extend correctly, while Xtended uses the past tense, a prominent misspelling and a large letter X. The marks sound similar when spoken aloud. In meaning, the marks are also similar. Xtreme's mark is phrased as a suggestion or imperative, while Xtended's mark presents a *fait accompli*. Nevertheless, both marks evoke cosmetic enhancement and some form of extension. Overall, the sight, sound, and meaning of the marks are not identical, but taking inferences in favor of Xtreme, we find them similar enough that this factor weighs towards confusion.

*Product similarity; outlet and purchaser identity; advertising media identity*. As noted above, the products sold by Xtreme and Xtended are nearly identical, and come in similar kits with silver carrying cases. The companies sell to the same class of professional beauticians and their clients, and advertise through similar media channels. These factors favor Xtreme.

*Defendant's intent.* As with the mark XTREME LASHES, there is no record evidence that Xtended intended to capitalize on the success of EXTEND YOUR BEAUTY. This factor is neutral.

*Actual confusion.* As discussed above, there is competent evidence that consumers have mistaken Xtended's products for Xtreme's. It is unclear whether this confusion occurred as a result of consumers mixing up the marks EXTEND YOUR BEAUTY and XTENDED BEAUTY. The confusion in the record appears to have resulted chiefly from confusion of the marks XTREME LASHES and XTENDED BEAUTY, especially due to the two marks' use of a large X. However, EXTEND YOUR BEAUTY appears in conjunction with XTREME LASHES and never alone. Therefore, one can reasonably infer that the consumer confusion stems, at least in part, from the similarity of EXTEND YOUR BEAUTY and XTENDED BEAUTY. This factor weighs in Xtreme's favor.

*Care exercised by potential purchasers.* As discussed above, even licensed cosmetologists have made mistakes and purchased the wrong kit. This factor weighs in favor of Xtreme for summary judgment purposes.

*Conclusion.* As with XTREME LASHES, most factors weigh in Xtreme's favor on the likelihood of confusion between EXTEND YOUR BEAUTY and XTENDED BEAUTY. The marks in this case are similar in sight, sound and meaning, although evidence of confusion is more attenuated. On the whole, we believe that the evidence on record creates a genuine issue of fact and the case should be tried to a jury. We therefore reverse the district court's grant of summary judgment on likelihood of confusion.

## III.

We hold that there is a genuine issue of fact whether: (1) there is a likelihood of confusion between Xtreme's mark XTREME LASHES and Xtended's mark XTENDED BEAUTY; (2) Xtreme's mark EXTEND YOUR BEAUTY is suggestive and protectable as a federal trademark; and (3) there is

a likelihood of confusion between EXTEND YOUR BEAUTY and XTENDED BEAUTY. We therefore reverse the district court's grant of summary judgment in favor of Xtended and remand for further proceedings.

REVERSED and REMANDED.