**REVISED February 14, 2019**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-20119

United States Court of Appeals
Fifth Circuit

**FILED**

January 8, 2019

Lyle W. Cayce
Clerk

SPRINGBOARDS TO EDUCATION, INCORPORATED,

Plaintiff - Appellant

v.

HOUSTON INDEPENDENT SCHOOL DISTRICT,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, KING and OWEN, Circuit Judges.

KING, Circuit Judge:

Springboards to Education, Inc., sued Houston Independent School District under the Lanham Act for using its marks in the course of operating a summer-reading program. The district court disposed of Springboards' claims on summary judgment because it concluded that a reasonable jury could not find that the allegedly infringing use of Springboards' marks was commercial in nature. We AFFIRM, albeit on alternative grounds: as explained herein, a reasonable jury could not find that the allegedly infringing use of the marks created a likelihood of confusion.

No. 18-20119

**I.**

Plaintiff Springboards to Education, Inc., ("Springboards") is an education-services company that specializes in promoting literacy among low-income and English-as-a-second-language students. In 2005, Springboards launched a program to motivate students to read that it entitled the "Read a Million Words campaign." Under that program, students who reach their goals to read a certain number of books win the "Millionaire Reader award" and are inducted into the "Millionaire's Reading Club." To incentivize students to join the Millionaire's Reading Club, Springboards hosts "red-carpet parties" featuring rented limousines for the successful students.

Springboards markets products and services to school districts to implement the program. Springboards' products include incentive items for participating students such as certificates, T-shirts, drawstring backpacks, and fake money. Between 2011 and 2013, Springboards successfully registered four trademarks with the United States Patent and Trademark Office in connection with the Read a Million Words campaign: "Read a Million Words," "Million Dollar Reader," "Millionaire Reader," and "Millionaire's Reading Club." It also registered "Read a Million Words" as a service mark. Springboards uses these marks on its incentive items and promotional materials.

Defendant Houston Independent School District ("HISD") is the largest public school district in Texas, serving more than 200,000 students. HISD, which is not a Springboards customer, launched its own monetary-themed incentive-based literacy program in 2008 called the "Houston ISD Millionaire Club." The Houston ISD Millionaire Club had a somewhat narrower focus than Springboards' program: it was a summer-reading program aimed at curbing the so-called summer slide, a phenomenon in which students lose progress gained over the academic year during summer vacation. HISD premised the

No. 18-20119

Houston ISD Millionaire Club on research showing that students can prevent the summer slide by reading five books over the summer. HISD officials testified that they developed the millionaire theme because HISD's 200,000-plus students would read more than one million books over the summer if each student read the requisite five books. These officials insisted that they were not familiar with Springboards or its marks at the time they developed the program.

Like Springboards, HISD encouraged participation in the program by rewarding students with items including certificates, T-shirts, drawstring backpacks, and fake money—all labeled "Houston ISD Millionaire Club." HISD also distributed informational material referencing the name "Houston ISD Millionaire Club." HISD rebranded its summer-reading program in 2014 to "Every Summer Has a Story" and ceased using the name "Houston ISD Millionaire Club."

Springboards sued HISD in federal district court. It alleged that HISD's use of "Houston ISD Millionaire Club" on its incentive items and informational material constituted counterfeiting, trademark infringement, false designation of origin, and trademark dilution, all in violation of the Lanham Act.[1] The parties filed cross-motions for summary judgment. The district court determined that Springboards could not prove HISD used its marks in a commercial manner, which, it opined, precluded each of Springboards' Lanham Act claims. The district court did not reach HISD's several alternative arguments, including its argument that Springboards could not show that HISD created a likelihood of confusion by using its marks. Accordingly, the

---

[1] Springboards additionally asserted analogous state-law claims, which the district court dismissed for lack of subject-matter jurisdiction. It likewise alleged HISD took its property without just compensation in violation of the Texas and United States constitutions. The district court dismissed those claims on summary judgment. Springboards only raises its Lanham Act claims on appeal.

No. 18-20119

district court granted HISD's motion for summary judgment and denied Springboards' motion. Springboards subsequently filed a motion for reconsideration, which the district court also denied. Springboards appeals.

## II.

We review the parties' motions for summary judgment de novo, applying the same standard as the district court. *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 895 (5th Cir. 2013) (per curiam). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the party's cross-motions for summary judgment, we examine "each party's motion independently" and view "the evidence and inferences in the light most favorable to the nonmoving party." *JP Morgan Chase Bank, N.A. v. Data Treasury Corp.*, 823 F.3d 1006, 1011 (5th Cir. 2016) (quoting *Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009)). "A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Biles*, 714 F.3d at 896. "Because our review is *de novo*, our analysis is not limited to that employed by the district court, and we 'may affirm the district court's decision on any basis presented to the district court.'" *Id.* (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)).

The Lanham Act is intended, inter alia, "to protect persons engaged in such commerce against unfair competition[] [and] to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks." 15 U.S.C. § 1127. It does so by "making actionable the deceptive and misleading use of marks" through various causes of action vested in the marks' owners. *Id.* Springboards seeks to enforce its trademarks and service mark through four such causes of action:

4

trademark infringement, counterfeiting, false designation of origin, and trademark dilution. We address each in turn.

## A.

A defendant is liable for Lanham Act infringement if the defendant uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). The district court focused on the requirement that the allegedly infringing use be "in connection with the sale, offering for sale, distribution, or advertising" of goods or services. Relying on out-of-circuit precedent, it concluded that this language requires the allegedly infringing use be commercial in nature, and it concluded that no reasonable jury could find HISD used "Houston ISD Millionaire Club" in connection with any commercial exchange. We express no opinion on the correctness of the district court's analysis; instead, we focus on HISD's alternative argument that its use of "Houston ISD Millionaire Club" was not "likely to cause confusion, or to cause mistake, or to deceive." *Id.*

To prove infringement, Springboards must show that HISD's use of "Houston ISD Millionaire Club" "create[d] a likelihood of confusion in the minds of potential consumers as to the source, affiliation, or sponsorship" of HISD's products or services. *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998). "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Id.* In other words, Springboards must show that potential consumers, when confronted with "Houston ISD Millionaire Club," would believe Springboards is somehow affiliated with HISD's summer-reading program or the branded incentive

items and informational material HISD distributed in connection with its summer-reading program.

In assessing likelihood of confusion, we examine eight nonexhaustive "digits of confusion":

> '(1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, . . . (7) any evidence of actual confusion[,]' . . . [and] (8) the degree of care exercised by potential purchasers.

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 453 (5th Cir. 2017) (alterations and omissions in original) (quoting *Bd. of Supervisors for La. State Univ. Agricultural & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008)). These digits are flexible: "They do not apply mechanically to every case and can serve only as guides, not as an exact calculus." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 485 (5th Cir. 2004). Accordingly, must keep in mind two important principles while applying these digits: (1) "we must consider the application of each digit in light of the specific circumstances of the case"; and (2) "we must 'consider the marks in the context that a customer perceives them in the marketplace.'" *Id.* (quoting *Elvis Presley Enters.*, 141 F.3d at 197).

We will examine each digit in turn. But given the atypical facts of this case, we first digress to consider the context in which this dispute arises. That context will then help channel our discussion of the eight digits of confusion.

We begin our detour by stating what is perhaps obvious, though easy to lose sight of when considering some of the parties' arguments: Springboards

brings a trademark claim—not a patent claim.[2] Accordingly, Springboards does not challenge HISD's use of a monetary-themed incentive-based literacy program. HISD could have copied the methodologies used in the Read a Million Words campaign step by step, and, whatever other problems that might have engendered, as long as it used clearly distinguishable nomenclature, Springboards would have no argument that HISD violated the Lanham Act in doing so. Thus, although the similarity between the parties' products and services is a digit of confusion relevant to the analysis, the focus of the analysis is on whether HISD misappropriated Springboards' marks, not whether HISD misappropriated Springboards' literacy-promotion methods.

Next, we must identify the class of consumers at risk of confusion and the point in the transaction at which the risk of confusion arises. *See Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir. 1983) ("If likelihood of confusion exists, it must be based on the confusion of some relevant person; *i.e.*, a customer or purchaser."); *accord Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 716 (Fed. Cir. 1992). In the typical likelihood-of-confusion case, these questions require little inquiry. Normally, the alleged infringer appropriates the senior mark user's goodwill by selling a product or service that the consumer might mistake as being in some manner affiliated with the senior mark user. *See, e.g.*, *Viacom Int'l v. IJR Capital Invs., L.L.C.*, 891 F.3d 178, 183-84 (5th Cir. 2018). The risk in such a case is that the purchaser will be confused at the point of the sale. *See* 4 McCarthy on Trademarks and Unfair Competition § 23:5 (5th ed. 2018 update) ("The most common and widely recognized type of confusion that creates

---

[2] The record does not indicate whether Springboards holds a utility patent on the methods it uses in its Read a Million Words literacy program. We do not intend to opine on whether such a patent would be available to Springboards.

infringement is purchaser confusion of source which occurs at the time of purchase: point of sale confusion.").

The relevant risk of confusion is not as clear in this case. Springboards' business model is premised on marketing the Read a Million Words campaign to school districts and selling those districts the products and services needed to implement the campaign. But Springboards does not allege that HISD directly competed with it by marketing the Houston ISD Millionaire Club to outside school districts. Rather, Springboards argues that HISD *itself* would have purchased Springboards' services were it not infringing on those services. Springboards does not argue—and it would be nonsensical to argue—that HISD confused itself into developing its own literacy program thinking that it was instead purchasing Springboards' program. The archetype therefore does not fit this case. But Springboards alludes to alternative sources of confusion, which we briefly explore.

Springboards suggests HISD's students and their parents might have been confused into thinking that HISD was using Springboards' program instead of its own. Regardless of whether that might have been the case, HISD's students and their parents are not the appropriate focus of the likelihood-of-confusion analysis. Although the ultimate recipients of HISD's services and products, the students and their parents were not purchasers in any ordinary sense.[3] They are better characterized as the "users" of the allegedly infringing products and services. *See* 4 McCarthy, *supra*, at § 23:7 (discussing circumstances under which "[c]onfusion of users" may be actionable). User confusion is actionable in some cases, but as the Federal Circuit has cautioned, only confusion in "those users who might influence

---

[3] Nor is there evidence that Springboards directly marketed its products and services to students or parents.

future purchasers" is actionable. *Elec. Design & Sales*, 954 F.2d at 718. Here, absent any evidence that HISD students or their parents exercise any influence over HISD's purchasing decisions, we need not consider the likelihood that HISD students and parents were confused about Springboards' role in the Houston ISD Millionaire Club initiative.

Next, Springboards suggests there is a risk that third-party educators were confused. Courts call this genus of confusion postsale confusion.[4] *See, e.g.*, *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1295 (11th Cir. 2018). *See generally* 4 McCarthy, *supra*, at § 23:7. In such cases, the purchaser of the infringing product or service understands the product or service is not affiliated with the senior mark user, but there remains a likelihood of confusion in third-party potential purchasers. *See Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 552 (6th Cir. 2005). The paradigmatic postsale confusion case arises when a consumer knowingly purchases a counterfeit of a luxury item—a designer handbag, for example. *See* 4 McCarthy, *supra*, at § 23:7 (collecting cases). Those who later observe the counterfeit item might mistake it as genuine, thus harming the senior mark user's goodwill by potentially leading the observer to believe the senior mark user's product is less scarce or of a lower quality than it actually is. *See id.*

Although there is no evidence that scarcity is important to Springboards' business model, there is some risk that if HISD's literacy program were inferior to Springboards' literacy program, then Springboards' potential customers might be deterred from purchasing Springboards' products and services by a mistaken association between HISD and Springboards. This

---

[4] We use the term "postsale confusion" to ground the alleged confusion here within the conceptual framework, although we recognize there was no actual sale involved.

No. 18-20119

would be actionable.[5] We therefore focus our digits-of-confusion analysis on whether there is a probability that HISD's use of "Houston ISD Millionaire Club" would confuse third-party educators into believing that Springboards is affiliated with Houston's summer-reading program.

**1.**

The first digit of confusion, the type of the mark, "refers to the strength of the mark." *Elvis Presley Enters.*, 141 F.3d at 201. The more distinct and recognizable the senior user's mark, "the greater the likelihood that consumers will confuse the junior user's use with that of the senior user." *Id.* We analyze two factors in determining the strength of a mark: (1) the mark's position along the distinctiveness spectrum, and (2) "the standing of the mark in the marketplace." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 330 (5th Cir. 2008).

The first factor refers to the five categories of increasing distinctiveness that marks generally fall into: generic, descriptive, suggestive, arbitrary, and fanciful. *See Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009). A generic mark is simply the ordinary name of the product. *See id.* A descriptive mark conveys information about the product or service. *See Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. July 1981). A suggestive mark "suggests, but does not describe, an

---

[5] We note that there is some question about whether Springboards must present evidence that HISD's program is inferior to its own to proceed on a theory of likelihood of postsale confusion. The Sixth Circuit has held that when such postsale confusion is at issue, the senior mark user must present evidence that the junior user's product or service is "clearly inferior" to the senior user's; otherwise, postsale confusion would not deter the senior user's potential purchasers. *Gibson Guitar Corp.*, 423 F.3d at 552. The Eleventh Circuit has explained "that the quality of a defendant's product is relevant to the harm suffered by the plaintiff" but has declined to "require a threshold showing that the defendant's product is inferior in quality." *Yellowfin Yachts*, 898 F.3d at 1295 & n.14. The parties do not address this question, so we do not endeavor to resolve it.

attribute of the good; it requires the consumer to exercise his imagination to apply the trademark to the good." *Xtreme Lashes*, 576 F.3d at 227. Arbitrary and fanciful marks have no relation to the product or service. *See* 2 McCarthy, *supra*, at §§ 11.5, 11.11.

Springboards argues that its marks are arbitrary. We disagree. "Read a Million Words" is descriptive. It states the goal of Springboards' campaign in plain English; no imagination is needed to understand what the mark is meant to convey. Springboards' other three marks—"Millionaire Reader," "Million Dollar Reader," and "Millionaire's Reading Club"—are suggestive. It requires some imagination to equate the traditional concept of a millionaire with a student who has read a million words. But the terms used in the marks are nevertheless related to Springboards' products: items given to students who read one million words in a monetary-themed literacy program.

On the second factor, a reasonable jury could not conclude that Springboards' marks enjoy strong standing in the market. Springboards cites to no evidence in the summary-judgment record showing that its marks are widely recognizable.[6] To the contrary, Springboards' damages expert conveyed that 87 percent of Springboards' revenue comes from a single school district in Edinburg, Texas.

Moreover, HISD presented unrebutted evidence of numerous other literacy programs predating Springboards' "Read a Million Words" campaign that use phrases identical or nearly identical language to Springboards' marks. These programs include an elementary school's initiative called "The Reading Millionaire's Project"; two different public libraries' reading programs called

---

[6] Citing primarily to evidence of *HISD's* success with its summer-reading program, Springboards argues that its marks are strong because there is high demand for literacy programs targeted at low-income students. But Springboards cites to no authority, and we therefore express no view, on whether the demand for a generic product has any bearing on the strength of the mark.

No. 18-20119

"Who Wants to Be a Million Dollar Reader?"; a Miami high school's contest called "the Million Words Campaign"; the Denver public school district's "Million Word Campaign"; and a Texas public school district's program that honors students as "Millionaire Readers" and inducts them into a "Millionaire's Club." Extensive third-party use of a term throughout the market suggests that consumers will not associate the junior mark's use with the senior mark user. *See Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 170 (5th Cir. 1986) (explaining common use of "XL" mark with various consumer goods "dilute[d] the strength of the mark"); *Sun Banks*, 651 F.2d at 316 (noting that prolific use of "sun" by Florida financial institutions weakened mark); *Duluth News–Tribune, a Div. of Nw. Publ'ns, Inc. v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1097 (8th Cir. 1996) ("[T]he widespread use of the words 'news' and 'tribune' throughout the newspaper industry precludes plaintiff from claiming exclusive privilege to use these words.").

In sum, although the fact that three of Springboards' marks are suggestive would normally indicate that the marks are strong, the strength of Springboards' marks is substantially undercut by their lack of recognition in the market and widespread third-party use. *See Sun Banks*, 651 F.2d at 315-17 (concluding arbitrary mark was weak because of widespread third-party use). Accordingly, the first digit suggests no likelihood of confusion.

**2.**

The second digit is the similarity of the marks. There is no doubt that there are commonalities between the marks, especially between Springboards' "Millionaire Reader Club" and HISD's "Houston ISD Millionaire Club." But "the use of identical dominant words does not automatically equate to similarity between marks." *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 765 (8th Cir. 2010). Although we do not entirely discount the common use of "Millionaire" and "Club" in both marks, viewing the marks as

a whole, a reasonable jury could not conclude these similarities suggest a likelihood of confusion. *See Oreck*, 803 F.2d at 171. HISD's use of "Houston ISD" in the mark especially mitigates the likelihood of confusion. *See id.* (concluding second digit weighed against confusion in part because junior user clearly identified itself on advertisement). The second digit favors neither party.

**3.**

The third digit is the similarity of the products or services. There can be little dispute that this digit favors Springboards. Both programs involve monetary-themed incentive-based literacy programs, and they distribute many of the same branded incentive items, including certificates, T-shirts, drawstring backpacks, and fake money. That Springboards' program seeks to encourage students to read during the academic year while HISD's program seeks to encourage students to read during the summer is not a meaningful difference. Accordingly, the third digit suggests a likelihood of confusion.

**4.**

The fourth digit is the identity of retail outlets and purchasers. This digit is an awkward fit to the facts of the case as HISD did not market the Houston ISD Millionaire Club and therefore had no retail outlets or purchasers. Nevertheless, HISD is a school district, and Springboards markets its products and services to school districts. Because we are focused on the risk that third-party observers will confuse HISD's program with Springboards' program, this overlap suggests some likelihood of confusion—an outside observer could have seen HISD using its own program and believed it purchased the program from Springboards. The fourth digit does not weigh nearly as strongly in

Springboards' favor as it would if HISD had marketed the program to third parties, but a jury could attribute to it modest weight nonetheless.

**5.**

The fifth digit is the identity of the advertising media used. This digit also does not fit neatly into this case because HISD did not market the Houston ISD Millionaire Club and therefore did not advertise. Springboards argues that this digit suggests a likelihood of confusion because "both parties use their marks on printed brochures, branded merchandise, the internet, and materials provided to consumers." Even to the extent this could be considered advertising in some literal sense of the word, it is not relevant to the likelihood-of-confusion analysis. The HISD advertising materials Springboards references were all either informational material distributed to parents and students to encourage participation in the program or incentive items distributed to the students as part of the program. Third-party observers who saw such material would not have erroneously believed HISD was marketing its services to outside school districts. By contrast, Springboards produced marketing material explicitly targeting school districts. This digit suggests no likelihood of confusion.

**6.**

The sixth digit is intent to confuse. Springboards points to no direct evidence of an intent to confuse, but it argues that the similarity of the parties' marks is circumstantial evidence of intent to confuse. Even assuming arguendo the similarity of marks alone could provide evidence of intent to confuse, the similarity of the marks does not provide such evidence in this case. Uncontradicted testimony from HISD officials established that HISD developed the millionaire theme for its summer reading program because the program's goal was for each of HISD's 200,000-plus students to read five books over the summer—exceeding one million books total. Officials who helped develop the program testified that they had not heard of Springboards or its

marks at the time. And as discussed above, millionaire-themed literacy programs were prevalent even before Springboards entered the equation, so it is not surprising that HISD would have developed the idea for the Houston ISD Millionaire Club independently of Springboards. Even when viewing the evidence in the light most favorable to Springboards, this digit weighs against a likelihood of confusion.

**7.**

The seventh digit is evidence of actual confusion. Springboards presents four declarations from witnesses who saw material from HISD discussing or promoting the Houston ISD Millionaire Club. But only two of those four witnesses identified themselves as educators. And neither of those two testified that he or she has any authority to purchase Springboards' products or services for his or her employer or otherwise influences such purchasing decisions. Further, only one of the educators, Raul Soto, attested that he believed the Houston ISD Millionaire Club was affiliated with Springboards. The other educator, Amy Rocha-Trevino, testified that she saw HISD's "'copycat' products" and that she saw a "Houston ISD Millionaire Club" night at a Houston Rockets game that "had nothing to do with Springboards." There is thus no direct evidence of any actual confusion by potential Springboards customers. A jury could conclude that Springboards' evidence of actual confusion weighs minimally in favor of finding a likelihood of confusion.

**8.**

The eighth and final digit is the degree of care exercised by potential purchasers. Under this digit, the greater the care potential purchasers exercise, the less likely it is they will confuse a junior mark user's products or services with the senior mark user's products or services. *See Streamline Prod.*, 851 F.3d at 458. We have held that "professional and institutional" purchasers "are virtually certain to be informed, deliberative buyers." *Oreck*, 803 F.2d at

173. There is no question this includes public school districts shopping for outside literacy programs. Nevertheless, Springboards argues that purchasers do not exercise care because many of its individual products—the incentive items distributed to the students—are low value. Springboards ignores the reality of its own program: it markets the program as a whole, not individual items. This digit suggests there is no likelihood of confusion.

**9.**

The ultimate question is whether a reasonable jury could conclude that it is likely potential purchasers of Springboards' products would have believed that Springboards was affiliated with HISD's summer-reading program. *See Scott Fetzer*, 381 F.3d at 484-85. Looking to the digits of confusion for guidance, we conclude that no reasonable jury could find a likelihood of confusion. Springboards' marks are not widely known and are similar or identical to multiple third-party marks. HISD did not market the Houston ISD Millionaire Club to Springboards' potential customers—i.e., third-party school districts. There is no evidence of an intent to confuse. And Springboards' potential customers are sophisticated institutional purchasers that are not easily confused. The only digit pointing unwaveringly in Springboards' favor is the similarity of the products. But even this does not strongly suggest a likelihood of confusion given the popularity of millionaire-themed literacy programs. Otherwise, there is some overlap in markets considering that HISD is a school district and Springboards markets to school districts, but the importance of this digit is undercut by the fact that HISD did not market the Houston ISD Millionaire Club externally.

Accordingly, the great weight of the digits suggests there is no likelihood of confusion. Without being able to show a likelihood of confusion,

No. 18-20119

Springboards cannot succeed on its infringement claim, so the district court properly granted summary judgment to HISD on this issue.

## B.

Springboards next alleges that HISD counterfeited its marks in violation of the Lanham Act. Likelihood of confusion is also an element of counterfeiting. *See* 15 U.S.C. § 1114(1)(a); *cf.* 4 McCarthy, *supra*, at § 25.10 ("[C]ounterfeiting is 'hard core' or 'first degree' trademark infringement . . . ."). Accordingly, Springboards' counterfeiting claim also fails because a reasonable jury could not find a likelihood of confusion. The district court therefore properly granted summary judgment to HISD on this issue as well.

## C.

Springboards must also show likelihood of confusion to succeed on its false-designation-of-origin claim. *See King v. Ames*, 179 F.3d 370, 374 (5th Cir. 1999) (explaining that likelihood of confusion is "essential element" for Lanham Act false designation of origin). Thus, the district court properly granted summary judgment to HISD on this issue.

## D.

Next, Springboards alleges trademark dilution. To succeed on its dilution claim, Springboards must show that its marks are "famous." 15 U.S.C. § 1125(c)(1); *see also Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 536 (5th Cir. 2012). For a mark to be famous, it must be "widely recognized by the general consuming public of the United States." § 1125(c)(2)(A). As discussed above, Springboards cannot make this showing. There is no evidence in the summary-judgment record that Springboards' marks are widely known among educators, never mind the general consuming public. On the contrary, the evidence shows that Springboards conducts 87 percent of its business in a single Texas school district. Further, Springboards' marks are identical or similar to marks used by several other literacy

17

No. 18-20119

programs. Accordingly, no reasonable jury could find Springboards' marks are famous and distinct, so the district court properly granted summary judgment to HISD on this issue.[7]

## III.

Lastly, we address Springboards' challenges to three procedural rulings the district court issued below. First, Springboards argues that the district court improperly denied its motion to extend the dispositive-motion deadline. Second, Springboards argues the district court improperly denied it leave to amend its motion for summary judgment. Third, Springboards argues the district court improperly denied it leave to amend its complaint. We review each of these rulings for abuse of discretion. *See Squyres v. Heico Cos.*, 782 F.3d 224, 236-37 (5th Cir. 2015).

The district court originally ordered discovery in this case to conclude by September 1, 2017. But Hurricane Harvey hit coastal Texas near the end of August 2017, disrupting multiple eleventh-hour depositions the parties had planned. The district court accordingly granted a series of extensions, eventually extending the discovery deadline to September 25, 2017. Springboards then moved to extend the deadline for dispositive motions from October 1 to October 25. Springboards explained that it would have difficulty complying with the deadline because Hurricane Harvey delayed the end of discovery and left it with little time to finalize its summary-judgment motion. It further argued that HISD had failed to produce certain "key documents." The district court denied that motion. Springboards filed a timely motion for

---

[7] Because no reasonable jury could return a verdict for Springboards on any of its claims, it follows a fortiori that a reasonable jury could return a verdict for HISD. Accordingly, the district court properly denied Springboards' summary-judgment motion. Likewise, because we conclude de novo that HISD is entitled to summary judgment, we also conclude that the district court properly denied Springboards' motion for reconsideration.

summary judgment, then later moved to amend its motion to add certified deposition transcripts it did not receive until after the dispositive-motion deadline.

A scheduling order "may be modified only for good cause." Fed. R. Civ. P. 16(b)(4). As we have expounded:

> There are four relevant factors to consider when determining whether there is good cause under Rule 16(b)(4): "(1) the explanation for the failure to timely [comply with the scheduling order]; (2) the importance of the [modification]; (3) potential prejudice in allowing the [modification]; and (4) the availability of a continuance to cure such prejudice."

*Squyers*, 782 F.3d at 237 (alterations in original) (quoting *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 167 (5th Cir. 2010)). Although the difficulty Hurricane Harvey caused is certainly a sufficient explanation for the delay, Springboards failed to elaborate on its need for the missing evidence in either its pre-deadline motion to extend or its post-deadline motion to amend. Accordingly, Springboards did not meet its burden to show good cause, and the district court did not abuse its discretion in denying those motions.

We also conclude the district court did not abuse its discretion in denying Springboards' motion to amend its complaint. Springboards moved to amend its complaint after the deadline for amended pleadings had passed. Springboards did not seek to add any claims; rather, it sought to drop its state-law trademark claims and "clarify" certain factual matters. The district court denied the motion. On appeal, Springboards argues that the district court should have granted the motion because the amended complaint would not have caused any delay below. But Springboards must show more than a lack of delay; parties must meet Rule 16(b)(4)'s good-cause standard to amend pleadings once the deadline to do so has passed. *See Filgueira v. U.S. Bank Nat'l Ass'n*, 734 F.3d 420, 422 (5th Cir. 2013) (per curiam). Springboards failed

19

No. 18-20119

to explain below and again fails to explain on appeal the importance of the amendment to its case. It therefore cannot show good cause. *See id.*

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.